WHITE, Trustee in Bankruptcy, etc., v. PACIFIC SOUTHWEST TRUST & SAVINGS BANK et al.

SAME v. UNITED BANK & TRUST CO. OF CALIFORNIA.

(District Court, S. D. California, N. D. December 11, 1925. Supplemental Opinion, February 6, 1926.)

Nos. 121, 122.

1. Assignments for benefit of creditors ⊙⟾54—Debtor's contract of itself held sufficient relinquishment and transfer of his property to trustees to effectuate trust.

Contract between debtor, certain creditors, and trustee representing other creditors, whereby debtor agreed to place all of his property in hands of trustees, who were to continue business for benefit of all creditors, held of itself an effective relinquishment of and transfer of debtor's property to trustees to effectuate trust, without additional muniments of title in form of deeds and assignments.

2. Assignments for benefit of creditors ⊙⟾197—Abandonment of trust agreement between debtor, certain creditors, and trustee of others held not established.

Where contract between debtor and certain creditors, and trustee representing other creditors, whereby debtor agreed to convey all his interests to trustees, who would manage it for benefit of all creditors, in consideration of further advances to pay creditors who could not wait, authorized trustees in their discretion to organize a corporation for purpose of carrying out such trust, held, that attempted organization of corporation by trustees, after unsuccessful attempt to proceed without it, which was wholly unexecuted, due to attitude taken by state commissioner of corporations and certain creditors, was not an abandonment of original trust plan.

3. Associations ⊙⟾1—Equity will look through form of association, and give effect of real purpose of organization.

Equity will look through form to get at real intent of association of individuals, and will give effect to real purpose of organization, in order to promote fair dealing and effectuate justice.

4. Bankruptcy ⊙⟾154—Banks joining in trust plan, on failure of plan and bankruptcy of debtor, held not entitled to set off deposits against indebtedness of bankrupt debtor.

Where debtor and certain creditors, including two banks and trustee representing other creditors, made contract whereby debtor agreed to convey all his interests to trustees, who would continue business in consideration of further advances to pay certain creditors who could not wait, held, in view of banks' knowledge and participation in trust plan, deposits previously held to credit of bankrupt and deposited by trustees of funds contributed by creditors, including banks, become special deposits, impressed with a trust against which banks could not, either under Bankruptcy Act, §§ 68a, 68b (Comp. St. § 9652), or Civ. Code Cal. § 3054, set off claims against bankrupt or corporation organized by trustees in furtherance of trust plan.

5. Bankruptcy ⊙⟾166(2)—Unlawful "preference" held not ground for denying bank right of set-off, voluntary act of debtor being essential to unlawful preference.

To constitute an unlawful "preference," under Bankruptcy Act (Comp. St. § 9585 et seq.), there must be a voluntary act on part of debtor, which creditor knows or has reason to believe will result in preference, and denial of bank's right to offset deposits against indebtedness of bankrupt cannot be based on ground of unlawful preference, where there was no consent to set-off.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Preference.

**6. Bankruptcy ⊂⊃166(3)—Bank may set off deposit made in good faith against claim against depositor, notwithstanding prior knowledge of depositor's insolvency.**

Where deposits were made in good faith in regular course of business, but not to enable bank to secure preference, bank has right to set off deposit against claim against depositor, who subsequently becomes bankrupt, nor is such right defeated by bank's prior knowledge or notice of insolvency of depositor.

**7. Banks and banking ⊂⊃134(7)—In absence of notice to bank of its trust character, a deposit is a general deposit.**

In absence of notice to bank of its trust character, a deposit is a general deposit as respects right of set-off.

**8. Bankruptcy ⊂⊃140(3)—Special fund raised by creditors in an endeavor to avoid bankruptcy held not part of bankrupt estate, but distributable pro rata to creditors who had contributed it.**

Where debtor, certain creditors, and trustee representing other creditors made agreement, whereby debtor agreed to convey all his interests to trustees, who would conduct business for benefit of all creditors, in consideration of further advances by certain creditors to pay others who could not wait, *held*, money so advanced and deposited in a special account by trustees, to be withdrawn only to pay claims intended, on failure of trust plan and bankruptcy of debtor, did not become part of bankrupt estate, and, under Bankruptcy Act § 47a, as amended in 1910 (Comp. St. § 9631), and section 67a (Comp. St. § 9651), trustees were required to distribute balance of fund pro rata to creditors who contributed to it.

**9. Courts ⊂⊃366(18)—State law controls as to what rights a lien or execution creditor of bankrupt would have, as affects rights of trustees.**

State law controls as to what rights a lien or execution creditor of bankrupt would have as against creditors, to which rights trustee, under Bankruptcy Act, § 47a, as amended in 1910 (Comp. St. § 9631), is deemed to be vested.

**10. Bankruptcy ⊂⊃184(2)—Creditors held not entitled to priority, in view of failure to record contract on which claim of priority was based.**

Where contract between debtor, certain creditors, and trustee, reserving to certain creditors, who agreed to advance additional funds to pay others who could not wait, in consideration of debtor's transfer of all his interests to trustees, who would conduct affairs for benefit of all creditors, a first lien on all property of debtor to extent of such further advances, was not recorded, though it constituted a conveyance, within Civ. Code Cal. §§ 1214, 1215, *held*, creditors so contributing, on failure of trust plan and bankruptcy of debtor, were not entitled to priority.

**11. Bankruptcy ⊂⊃151—Bankruptcy Act, as relates to rights of trustees construed; "vested with rights, remedies and powers of a judgment creditor."**

Bankruptcy Act, § 47a, as amended in 1910 (Comp. St. § 9631), declaring trustees "shall be deemed to be vested with all the rights, remedies, and powers of a judgment creditor," does not mean "the rights, remedies, and powers" of a judgment creditor, who, under Code Civ. Proc. Cal. § 409, would not be entitled to file a lis pendens, but includes such a creditor.

**12. Bankruptcy ⊂⊃188(3)—Creditors of bankrupt debtor entitled to preferred payment in full of checks on special fund, previously issued by trustees of debtor before bankruptcy.**

Where certain creditors, in effort to avoid bankruptcy of debtor, agreed, in consideration of his conveying all his interests to trustees, to advance further funds, to be placed in a special account, and used only in paying 25 per cent. of claims of creditors who could not wait, which was done, *held*, on failure of plan and bankruptcy of debtor, creditors holding checks on such special deposit, which had been denied payment by bank asserting right to set off deposit against bankrupt, were entitled, on finding that there was no right of set-off, and a transfer of fund of deposit to trustees, to payment in full of their checks, which in effect constituted equitable assignment to them.

In Equity. Two suits by William E. White, as trustee in bankruptcy of E. Y. Foley, Inc., and as trustee of E. Y. Foley, one against the Pacific Southwest Trust & Savings Bank and others, and the other against the United Bank & Trust Company of California. Decrees for plaintiff for partial relief only.

Theodore M. Stuart, of Fresno, Cal., for plaintiff.

Harris & Hayhurst, of Fresno, Cal., for defendants Tarpey and Pruner.

D. S. Ewing, Everts, Ewing & Wild, and D. F. Conway, all of Fresno, Cal., for defendant United Bank & Trust Co.

Milton M. Dearing and Robert M. Thomas, both of Fresno, Cal., for defendant Pacific Southwest Trust & Savings Bank.

Ward Chapman, of Los Angeles, Cal., for defendant Lynes.

McCORMICK, District Judge. By these suits in equity the trustee of the bankrupt estates of E. Y. Foley and E. Y. Foley, Inc., a corporation, seeks to recover from the two defendant banks certain money for the benefit of said estates. Action was brought by the trustee against each bank separately, but for expedition and by stipulation of all parties the causes were heard simultaneously, inasmuch as the paramount issues were the same in each case. However, there was no consolidation of the cases, and each cause has received separate consideration, as some issues are not common to both defendants.

The main question is the right of the banks to retain, in the case of the Pacific

Southwest Trust & Savings Bank $127,433.76, and in the case of the United Bank & Trust Company of California $41,171.03, to the exclusion of the estates and the creditors in general thereof. Incidentally there has been brought into the case in which the Pacific Southwest Trust & Savings Bank is defendant issues between one Lynes, as trustee of certain Eastern creditors of E. Y. Foley and E. Y. Foley, Inc., a corporation, and the plaintiff, as to the money sued for in the event that it is held that the defendant Pacific Southwest Trust & Savings Bank withholds the same without right.

In the same case there are also collateral issues, raised by one Pruner and one Tarpey, who have filed answers and counterclaims in said action, asserting rights so to do as parties interested in said action and in the funds in suit therein; each of said parties claiming to have been sued under a fictitious name, as is also the contention of Lynes. Plaintiff has made no objections to the right of Lynes, Pruner, or Tarpey to appear in said action in the manner stated. In fact, he has invited the submission of their claims for consideration and adjudication in this action to avoid a multiplicity of suits.

The defendant Pacific Southwest Trust & Savings Bank, which will be referred to herein as the Pacific Southwest Bank, has filed answers to the pleadings of Lynes, Pruner, and Tarpey, joining issue with each as to the enforceability of their respective claims against the bank, but raising no question as to the right to have such issues determined in this suit.

The United Bank & Trust Company of California, a corporation, which for brevity will be called the United Bank, is the sole defendant in the other suit, and the collateral issues between plaintiff and Lynes, Pruner, and Tarpey, in so far as the right of said United Bank to offset is concerned, are not involved in the case in which said United Bank is sole defendant; but, if it is held that said United Bank has no exclusive right to the money in its possession, then the same question arises between Lynes, as trustee, and plaintiff, as in the case in which the Pacific Southwest Bank is a defendant.

The allegations in the bill in each case are substantially the same, and may be epitomized as a claim that the moneys sued for in each case constitutes part of a trust fund, which the two banks knew was created for the benefit of all of the creditors of E. Y. Foley and E. Y. Foley, Inc., a corporation, and which the banks, respectively, have no right to retain as against the trustee in bankruptcy. Each bank, in its answer, after admitting that it withholds and claims the money in suit, denies that the money which it withholds is a trust fund, or is impressed with any trust whatever, and each bank affirmatively claims that the money sued for respectively came into its possession respectively in the ordinary and usual course of business and created, as between E. Y. Foley, or E. Y. Foley, Inc., a corporation, and the respective bank wherein the money was deposited, the relation of debtor and creditor, and that the respective bank, by retaining the money, does so under its right of set-off, pursuant to section 68 of the National Bankruptcy Act (Comp. St. § 9652) and the banker's lien right under the laws of California (section 3054, California Civil Code).

The solution of the questions in this case has not been an easy task. The evidence is voluminous and complex, and has required close analysis and deliberation. It is not without conflict. Some of the questions of law are close, as well as novel. However, I am persuaded, after careful study, to conclude that a trust, substantially as alleged by the plaintiff in his complaints, has been established, and that the banks, respectively, have no right, under the evidence and the law applicable to these cases, to retain such moneys to the exclusion of the general creditors of E. Y. Foley and E. Y. Foley, Inc., a corporation.

Preliminarily it should be noted that this court, as well as the Circuit Court of Appeals of the Ninth Circuit, has held that E. Y. Foley and E. Y. Foley, Inc., a corporation, are, in so far as the present litigated issues in these suits are concerned, one and the same. In re Foley, 4 F.(2d) 152, 154.

The bankrupt, Foley, was in the year 1922 extensively engaged in buying, producing, packing, and selling green and dried fruits, and was in that period the owner of and in the personal conduct of a great business organization, operating as E. Y. Foley. His principal office and place of business was at Fresno, Cal., although his operations and activities extended throughout the United States. He had encountered unsatisfactory market and transportation conditions in that year to such an extent that in November thereof he was so financially embarrassed that failure and bankruptcy were imminent, unless he could effect some new arrangement with his many creditors. He was heavily indebted to three groups: The growers in San Joaquin Valley, California, from whom he

bought his merchandise; the Eastern produce and commission firms and brokers, to and through whom he sold his merchandise; and the California banks and materialmen, from whom he obtained credits and supplies with which to carry on his business. His largest single creditor was the defendant Pacific Southwest Bank with whom he transacted most of his banking business, and which institution was thoroughly conversant with his financial and business condition at all times.

The growers and other creditors were demanding immediate payments on their accounts, and some of them were threatening attachment and other litigation. Foley, in extremis went East in November, 1922, and informed his creditors there of his financial depletion, and endeavored to obtain a loan from them, so as to give him additional working capital and save his business from disaster. His principal concern was to be able to satisfy the growers, by making some immediate payments on their accounts, in order that he might continue to receive fruit during the forthcoming season. He was unsuccessful in procuring the loan, but induced two of his principal Eastern creditors, F. E. Nellis and one Andrews, who were really a committee representing his Eastern creditors, to return with him to Fresno in order that they might study his affairs, confer with the banks and other Western creditors, and if possible effect a plan wherein Eastern and Western creditors, other than growers, would advance money so as to settle pressing claims and satisfy the growers, in order that Foley's business could be continued as a going concern, to the primary end that all of his creditors would be paid or satisfied, and ultimately that Foley would be rehabilitated in business.

This committee, on arrival in Fresno, Cal., in December, 1922, frequently met with managing officers of the two defendant banks, to wit, W. A. Sutherland, of the Pacific Southwest Bank, and C. R. Puckhaber, of the United Bank, and a third person, L. M. Say, who represented the growers at such meetings. Foley's affairs were freely and thoroughly discussed and considered by the conference; Foley being present at some of the meetings, and at all times furnishing the conference with complete information concerning his exact financial and business status. At the instance of the Eastern creditors, an audit of Foley's business had been made as of November 30, 1922, and this audit was presented to the conferences. On its face it indicated that Foley was solvent by some $200,000, but it was known to all of the conferees that certain assets had been overestimated in the audit, and all realized and appreciated that as a matter of fact Foley was actually insolvent at the time of these meetings, and had been for some time previously, and, if bankruptcy occurred, the creditors would receive about 25 cents of each dollar of their accounts.

The result of these conferences was that demand was made upon Foley that he make a transfer of all of his property and business for the benefit of his creditors. Foley agreed to do so. The plan was that Foley would relinquish control of all of the property he possessed, or in which he had any interest, to trustees, who would hold, manage, and conduct his business and property for the benefit of all of his creditors, and who would exercise sole, complete, and exclusive control and dominion over the same until his creditors had been fully satisfied, in which event the trustees were then to reinstate Foley into the personal conduct and ownership of his business. It was also part of the scheme agreed upon between Foley and the conferees that Foley was to remain in the business as an agent of the trustees, and was to devote his personal time and attention in carrying out the proposed scheme and in consummating the liquidating plan agreed upon.

The agreed plan further contemplated that certain Eastern creditors and certain Western creditors, including banks, were to contribute or advance not to exceed $300,000, each of said groups to contribute equally, and this fund was to be delivered to the trustees, or remain under their control, as part of the trust, and was to be used by the trustees in liquidating pressing claims, especially those of the growers, that could not be deferred, and in continuing the Foley business under the trusteeship for the benefit of all of the creditors. Those who contributed to this fund and trust were to be primarily protected against loss on account of their contributions thereto, and were to have a preferred status or lien upon the entire trust estate proportionately for the amount of their contributions, respectively.

It was known that the trust plan would be ineffectual unless sufficient creditors of Foley would consent thereto and join therein. So it was agreed by the conference that 60 days be specified as the time within which sufficient creditors could be enlisted in the scheme to make it practicable and reasonably sure of accomplishment, and that if, in the judgment of the trustees, enough creditors did acquiesce within the 60-day period, then,

upon the trustees so declaring, the trust became operative, binding, and in full force and effect upon all so assenting for a period of one year, and in such event all consenting creditors agreed to forbear and extend the time of payment of their respective accounts and demands against Foley and his business for that one-year period. There was to be no personal liability on the part of the trustees for any act done or omitted under the trust, and it was further agreed that, if the trustees determined, in the exercise of their discretion, that the trust and its purposes could be more satisfactorily executed for the benefit of the creditors through a corporation, then they were empowered and authorized to organize or cause to be organized such corporation.

The conference plan was embodied in a written agreement, dated January 26, 1923, which written agreement was in large part prepared by W. A. Sutherland, executive vice president of the Pacific Southwest Bank, at Fresno, Cal. The agreement was signed by Foley and originally by three persons, named therein as trustees, namely, W. A. Sutherland, representing Pacific Southwest Bank, L. M. Say, representing grower creditors, and J. E. Lynes, representing Eastern creditors, and, upon being circulated among the creditors of Foley, the agreement was signed by each of the defendant banks and nearly all of Foley's other creditors, over 90 per cent. in amount and number concurring therein. On March 12, 1923, the number of trustees was increased to five, G. V. Lyddane, representing Western materialmen, and C. R. Puckhaber, an executive managing officer of the defendant United Bank, being added to the trustees, both having signed the written trust agreement of January 26, 1923.

Under date of February 19, 1923, certain of the Western creditors, including the two defendant banks, entered into a written agreement confirming the trust agreement of January 26, 1923, and agreed to contribute their part of the fund to be raised in order to accomplish the purposes of the trust pursuant to the January 26th contract. This February agreement provided that notes were to be executed by the trustees for the advances, but that there was to be no personal liability thereunder by the trustees, and the contributors to the fund were to be secured therefor by a first and prior lien against all of the property of the trust, and were to be reimbursed proportionately out of the first money realized from the proceeds of the property and of the business.

Under date of March 14, 1923, a similar agreement was entered into by the Eastern creditors, which constituted one Lynes as the agent of said Eastern contributing creditors, authorizing him to pay over to the trustees, pursuant to the terms and conditions of the January 26th trust agreement, $90,000 of their agreed contribution of $150,000 (which $90,000 had been transmitted to the Pacific Southwest Bank at Fresno, Cal., by the Eastern contributing creditors, to be later used and applied under and for the purposes of the trust of January 26, 1923). This March 14th agreement also contained a statement that the moneys contributed were to be secured by a first and preferred lien upon the property of the trust.

The contents of these three agreements were well and thoroughly known to each of the defendant banks, and were expressly agreed to by each of said banks. This statement would be entirely too long, if all of the steps subsequent to the December and January conferences were detailed. It is sufficient to observe that, immediately after the agreement of January 26th, Foley's business assumed new aspects. Foley was no longer in personal control or management thereof. The trustees held regular meetings and were in active and complete charge and control of the business. They placed C. P. Hamilton, of the Pacific Southwest Bank, in charge of Foley's office, and all of the transactions were under the surveillance of the trustees and Mr. Hamilton, who acted as the secretary of the Foley trustees, continuing in such capacity down through all of the succeeding months and subsequent to the organization of E. Y. Foley, Inc., and until the involuntary petition for bankruptcy was filed herein on September 13, 1923. No moneys were withdrawn from the banks wherein they were deposited, after February, that were not authorized or directed to be so withdrawn by the trustees.

[1] The trust plan, as embodied in the January 26th agreement, met with such general approval by the creditors that the trustees named, on March 12, 1923, at a regular meeting, declared that the plan and trust was effective and operative, and adopted a formal set of rules for their guidance, which all the trustees signed. They demanded that Foley comply with the terms of the January 26th agreement, and transfer all of his property to the trustees in pursuance thereof. Foley complied with this demand, and made the deeds and assignments of all of his property to the Pacific Southwest Bank, as custodian for the trustees, instead of to the trustees di-

rect. This was done to facilitate transfers, and also to obviate the recording of the trust agreement of January 26th, and did not in any way modify or alter the trust arrangement. All of Foley's property was transferred and assigned by him before the expiration of the 60-day period mentioned in the contract of January 26th. In my opinion, the January 26th contract of itself was sufficient relinquishment and transfer of Foley's property to the trustees to effectuate the trust, without the additional muniments of title which were made and delivered by Foley later in the form of deeds and assignments, etc. Higgins v. Higgins, 121 Cal. 487, 53 P. 1081, 66 Am. St. Rep. 57.

At this meeting of March 12th the trustees also decided to call in the subscriptions from the Eastern and Western creditors, and issued instructions to Mr. Hamilton, secretary of the Foley trustees, to send out letters to the various subscribers, requesting the money immediately. The call was for $200,000, as under the supervision and consent of the trustees and creditors Foley had made a sale of some property in February for $138,000 in cash, and this money was deposited, under the direction of the trustees, in a special trustee account in the Pacific Southwest Bank. All of the trustees, including the two managing officers of the defendant banks, were present and participated, and acquiesced in the action of the trustees at the meeting on March 12th. In the latter part of March Mr. Sutherland resigned as a trustee, and at his suggestion B. M. Hopper, a member of the executive committee of the Pacific Southwest Bank, was appointed a trustee.

The creditors who were asked to contribute to the fund of $300,000, as provided in the January 26th contract, did so in March, 1923; their contributions being with the distinct understanding and expressed condition that they were each to have a prior and preferred lien upon all of the trust estate as security for reimbursement and repayment of their advances. There was $180,000 collected or assured from the Eastern and Western creditors in this manner, and this fund was accumulated in the Pacific Southwest Bank at Fresno. The specific deposit, however, was not used by the trustees, on account of difficulties which subsequently arose.

It is plain from the evidence that by March 27, 1923, which was the expiration of the 60-day period in the January 26th contract, everything contemplated by that contract and the two collateral creditors' agree-

ments looking toward the creation of the trust concerning Foley's business had been completed. There can be no serious contention that the trust created by the agreement of January 26th never became effective. I do not understand such to be the serious contention of either defendant bank. It is asserted, however, that, although the trust plan incorporated in the January 26th agreement did come into full force and effect, it was afterward entirely abandoned, and a complete new scheme of liquidation and settlement inaugurated by Foley and his creditors. [2] With this contention I am not in accord. There was a period after March 27th when it seemed that the trust plan agreed upon would fail, and that receivership or bankruptcy would ensue. This was caused principally by two of the trustees, Puckhaber and Lyddane, refusing to sign notes to the contributing creditors for the amounts of their advances to the $300,000 fund, asserting fears of personal liability on such notes. But the abandonment of the trust was averted as a result of further deliberations of the trustees, assisted by one Nellis, an Eastern creditor, who had been largely instrumental in bringing into existence the trust plan of settlement. The testimony of Nellis, as well as his correspondence with the trustees and the circumstances thereof, convince me that he regarded the corporation as a continuation of the trust idea of the January agreement, which he was instrumental in bringing about.

The board of trustees concluded to abandon, not the trust plan, but the method or form of executing it. There were certain letters prepared and sent to creditors by individuals, who were trustees, in which it was stated that the trust plan had been definitely abandoned; but no such action was ever taken by the trustees as such. They did decide that, instead of continuing to function as personal trustees, they would exercise their right under the January 26th agreement, and organize a corporation which would take over all of Foley's business, and of which they would retain control for the creditors. This corporation was an outgrowth of the agreement of January 26th and conferences of the trustees and creditors of Foley during the months of March, April, May, and June, 1923. It was organized in June, 1923, and immediately supplanted and succeeded the personal trusteeship. Its board of directors consisted of nine persons, five of whom were the five individual trustees under the earlier method of administrating the trust. The vot-

ing stock was so distributed and tied up that control of the corporation remained for the period of seven years with the persons who had been made trustees for the creditors. The same general character of the trust of January 26th was preserved and remained, although some details thereof were modified, which in no way effaced or destroyed the trust feature of the Foley business.

[3] I cannot characterize better my view of the situation, with respect to the claim of defendant banks that E. Y. Foley, Inc., was not the trust contemplated or created by the agreements of January 26th, February 19th, and March 14th, than to say that the trust idea or scheme concerning Foley's business was identical in the personal trusteeship and in the later corporation, but that the vehicle carrying and executing the trust was differently formed. Equity, however, will look through the form to get at the real intent of the association of individuals, and will give effect to the real purposes of the organization, in order to promote fair dealing and effectuate justice. Llewellyn Iron Works v. Abbott Kinney Co., 172 Cal. 210, 155 P. 986; Erkenbrecher v. Grant, 187 Cal. 7, 200 P. 641; 6 California Jurisprudence, 592.

Applying this equitable principle to the facts and circumstances of these suits, there is little doubt in my mind that all concerned in the organization of E. Y. Foley, Inc., including the two defendant banks, understood, realized, and knew that the corporation was a continuation of the trust created by the creditors of E. Y. Foley, including the two defendant banks, and E. Y. Foley, under the agreements of January 26, February 19, and March 14, 1923. The corporate plan of the trust was not a success. The corporation was prevented from carrying out and consummating the trust by the attitude of certain creditors, as well as by the opposition of the corporation commissioner of California. So that, instead of satisfying and discharging the claims against the business, an additional indebtedness was created between July and September, 1923, of over $400,000, which frustrated the trust plan of settlement and rehabilitation of Foley's affairs, and resulted in the involuntary petition in bankruptcy being filed on September 13, 1923.

The claim of one of the defendant banks that the corporation from its inception never intended to pay "a single solitary cent of the indebtedness of E. Y. Foley," and that it contemplated taking over the assets of Foley without any of his indebtedness, is untenable, when considered in the light of the evidence

as to the assumption and payment of at least 25 per cent. of the growers' accounts with money advanced for the use of the corporation by creditors of Foley, pursuant to the contracts of January 26, February 19, and March 14, 1923, and also in the light of the evidence relating to the correspondence by the officers of the corporation with the creditors of Foley regarding their claims; it appearing that much of the correspondence by the secretary of the corporation was carried on by him as "Secretary, Foley Trustees," which was the same designation employed by him during the existence and operation of the personal trusteeship, and manifests that in his own mind, at least, there was no change in his capacity, or in the capacity of the association of persons for whom he acted as secretary.

It is earnestly contended by able counsel for defendant banks that, because the money subscribed by the creditors in March toward the $300,000 fund was later returned by the trustees, and new plans discussed by the creditors after the personal trustees refused to sign notes to the contributors, and because new petitions and letters were sent out thereafter, outlining the corporation plan and soliciting the assent of the creditors thereto, in addition to requesting recontributions of the $300,000 fund, it is clear that the trust was entirely abandoned. It seems to me that a complete answer is apparent when we consider that no specific corporate plan was contained in the earlier agreements, and that when the details of the contemplated corporation had been worked out, in the conferences of the personal trustees with Nellis and Sutherland in the spring of 1923, it was expedient and desirable, if not necessary, for the trustees to procure the consent of the creditors to a stock distribution plan of settlement, in lieu of the personal trustee note plan. It is also noteworthy that, although the contributors were requested to again send their money under the corporation plan, when they did so in August, 1923, it was expressly stated that they were advancing the money to the "Foley trustees," and that it was understood that the "trustees' note" for the amount subscribed would be forthcoming to them.

The $200,000 which was thus subscribed and deposited in a special account, designated "E. Y. Foley, Inc., Special Account A," in the Pacific Southwest Bank in Fresno, was received and accepted under such circumstances and conditions, and the trust that was thereby impressed upon this money,

and as a result of the contribution of this money under the agreements of January, February and March, 1923, upon all of the property of E. Y. Foley and E. Y. Foley, Inc., cannot be ignored or repudiated. There was never any change in the character of the money contributed or advanced by the Eastern and Western creditors to straighten out the affairs of E. Y. Foley and to extricate him from under his financial burden. It was originally impressed with the trust of January 26, 1923, and the two subscription agreements made subsequently, and the impression thus made was never effaced or removed, and continued on all of the property of E. Y. Foley and E. Y. Foley, Inc., up to the time of the adjudication in bankruptcy herein. The money contributed by the Eastern creditors, although sent back to Lynes after the personal trustees refused to sign the notes, never actually reached the contributors, but was held intact by their agent, and remitted through Lynes to the Pacific Southwest Bank, where it was again deposited in a special account in the name of the corporation. The money was simply withdrawn temporarily, until such time as the trustees formulated a more satisfactory method under the trust agreement to execute the trust. It was sent in the second time for the same reason and under the same understanding as originally, and the same is true with respect to the second contributions made by Western creditors, which were also deposited in the same special fund in the Pacific Southwest Bank in Fresno, and the creditors, including the two defendant banks, were fully cognizant of these facts.

It cannot be held that there was ever any abrogation or nullification of the original agreements under which the moneys were subscribed to the trust. The creditors did, under the corporation plan, acquiesce in a prospective modification of the agreements relating to the payment of their claims. They agreed to accept preferred stock and the corporation note. They received neither. The prospective change in the method of payment under the corporation plan having completely failed, because of the attitude of the California commissioner of corporations and the obstinacy of certain creditors, the prospective modification was wholly unexecuted, and therefore did not in any way alter the original trust, under which the fund of $200,000 was obtained from the contributing creditors.

There is one further contention of defendant banks on the question as to whether the

original trust scheme was abandoned before the organization of E. Y. Foley, Inc., that should be adverted to in this statement. It appears that, after Foley had made and delivered deeds of his real property, and deposited them with the Pacific Southwest Bank for the individual trustees, under the January 26th agreement, when it became evident that the individual trustees would not sign notes to the contributors to the $300,000 fund, the deeds were never used in the form in which they were originally executed. The record in this case is so vague and indefinite as to whether these original deeds were ever redelivered to Foley that I am unable to make a finding thereon. There can be no question, however, that a second demand was made upon Foley, after the incorporation of E. Y. Foley, Inc., for deeds to his real property, and that he complied therewith by conveying all of his real property to the corporation. To my mind this circumstance does not indicate an abandonment of the original trust idea, but rather simplification of the method of vesting the title to Foley's real property in the corporate trustee. The same result would, of course, have been attained by a conveyance from the Pacific Southwest Bank, the grantee named in the original deeds executed by Foley for the individual trustees; but this method was not only circuitous, but might have aroused suspicions on the part of the creditors that would have thwarted the entire trust arrangement. I do not regard the making of second deeds in the manner shown by the record as any evidence of abandonment of the trust idea under the agreements of January 26, February 19, and March 14, 1923.

The evidence shows beyond doubt that both of the two defendant banks were thoroughly informed and conversant with every step taken by Foley, the personal trustees, the corporate trustee, and the Foley creditors, from the time that Foley informed the two defendant banks of his financial embarrassment in December, 1922, until the adjudication of bankruptcy in October, 1923. Both banks knew that subsequent to March 27, 1923, and probably from as early as the middle of February, 1923, all of Foley's business and property of every kind was being managed, conducted, owned, and controlled by trustees for the benefit of all of Foley's creditors; and both of the banks, in continuing to do business thereafter concerning Foley's affairs, must be held to have done so with notice and knowledge that they were dealing with such affairs, not in the ordinary

and usual course of business, but under an extraordinary and trust arrangement for the benefit of the creditors. Finally, it is worthy of note, upon the question as to whether the two banks have not, by their own express conduct, waived any right of set-off which ordinarily exists where general deposits are made, that both banks signed the agreement of January 26, 1923, wherein they extended the time for the enforcement of claims against the Foley business for one year, at least, and there is therefore some reason to hold that by so doing they have waived and relinquished their right of set-off for the period stated. Under such circumstances, equity and good conscience would seem to require that the banks be estopped from doing that which by their own solemn agreement they agreed not to do.

[4] Having reached the conclusion that under the evidence it has been established that the agreements of January 26, February 19, and March 14, 1923, became binding and operative upon all of the creditors of Foley who assented thereto, and that all of the property of E. Y. Foley and/or E. Y. Foley, Inc., were impressed with a trust for the benefit of all of the creditors of Foley, we are brought to a consideration of the ultimate question in these suits, as far as the banks are concerned, namely: Did either of the defendant-banks have the right to offset funds in its hands against indebtedness of E. Y. Foley and/or E. Y. Foley, Inc.?

Two offset rights are claimed by each bank: First, under section 68 of the National Bankruptcy Act, which reads as follows:

"*Set-Offs and Counterclaims.*—a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

"b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate; or (2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent, or had committed an act of bankruptcy."

Comp. St. § 9652.

And, secondly, under section 3054 of the California Civil Code, which is as follows:

"*Banker's Lien.*—A banker has a general lien, dependent on possession, upon all property in his hands belonging to a customer, for the balance due to him from such customer in the course of the business."

[5] Plaintiff's contention that a set-off in these cases does not exist, because to allow same would be to permit a preferential transfer to the banks, which is prohibited by clause (2) of subsection (b) of section 68 of the Bankruptcy Act, has no merit. To constitute a preferential transfer, there must be some voluntary act on the part of the debtor, which the creditor knows or has reason to believe will result in a preference. In other words, the assent of the depositor or creditor must appear. Admittedly there was no consent by any one to the action of either bank in making the set-off in these cases. Collier on Bankruptcy (13th Ed.) vol. 2, p. 1612, note 62, and cases cited; Continental Trust Co. v. Chicago Title Co., 229 U. S. 435, 33 S. Ct. 829, 57 L. Ed. 1268.

[6] It must be conceded that it is clearly established by the authorities that, where deposits are made by a depositor in good faith in the regular course of business, and not for the purpose of enabling the bank to secure a preference, the bank has a right to set off a deposit against a claim held by it against a depositor who subsequently becomes a bankrupt. Collier on Bankruptcy (13th Ed.) p. 1612; New York County National Bank v. Massey, 192 U. S. 138, 24 S. Ct. 199, 48 L. Ed. 380. And the bank's right to set-off in such cases is not defeated because it has knowledge or notice of the insolvency of its depositor. In re Wright-Dana Hardware Co. (D. C.) 207 F. 636; New York County National Bank v. Massey, supra; Studley, etc., v. Boylston Bank, 229 U. S. 523, 33 S. Ct. 806, 57 L. Ed. 1313.

[7] It is also true that, where there is no notice to the bank of its "trust" character, a deposit therein is a general deposit, there being a presumption that deposits are general, and not special or trust. In re Cross (C. C. A.) 273 F. 39; Bank v. Hopkins, 199 F. 873, 118 C. C. A. 321; American Surety Co. v. Bank, 63 Cal. App. 149, 218 P. 466; People v. California, etc., Co., 23 Cal. App. 199, 137 P. 1111, 1115. And that if a deposit in a bank is general, and if made in the ordinary course of business, the relation of debtor and creditor exists between the bank and the depositor, whence the right of set-off arises in cases of mutual debts or mutual credits between the bank and the depositor, which right will be recognized and enforced in bankruptcy. New York County National Bank v. Massey, supra.

Now, were the deposits in the two banks,

which were offset, general deposits made in the ordinary course of business? I think not. Not only was each bank fully acquainted with Foley's financial difficulties from December, 1922, but each bank had signed the agreements by which Foley divested himself of his property and business, and turned everything he owned or possessed over to the trustees for the benefit of all of his creditors. Every dollar that Foley owned, or in which he had any interest, or which he had on deposit in any bank, or elsewhere, thereby went into a trust fund, to be administered in accordance with the agreements that were assented to by the two defendant banks. Consequently the deposits in both banks which were made after the trust became operative should be treated as special deposits for the benefit primarily of creditors, and not as general deposits.

As far as the Pacific Southwest Bank was concerned, it did more than assent to the trust arrangement. Immediately after the agreement of January 26th, it opened accounts for the Foley business, and continued throughout thereafter to carry the funds of the business of the personal and corporate trustees in differently designated accounts down to the time of the attempted set-off. The $200,000 which was contributed by the Eastern and Western creditors was deposited August 17, 1923, in an account designated "E. Y. Foley, Inc., Special Account A," and was not subject to general check, but was used and intended to be used entirely to pay the growers 25 per cent. of their claims, and other pressing claims that could not be deferred, in order to temporarily satisfy such creditors, so that they would come in with the other Foley creditors on the trust plan. All but $57,988.41 of this special account was disbursed in this way, and the bank offset such balance on September 1, 1923, as against overdrafts on Eastern firms, unpaid notes for loans made by the bank to E. Y. Foley, Inc., and the bank's contribution of $47,619.05 to the trust fund of $200,000.

In my opinion, all of the other moneys on deposit in both banks fall in the same category. The only real difference between the deposits in the two banks is that no part of the $200,000 contributed money was deposited in the United Bank. Nevertheless, Mr. Puckhaber, a managing executive of that bank, was a trustee from the beginning, and acted as such because the United Bank was a large creditor of Foley. This bank also signed the agreement of January 26th and

of March 14th, and had knowledge at all times that the business was being conducted, not in the ordinary and usual course, but as a trust for the benefit of all of Foley's creditors, and as security for advances made by certain of Foley's creditors. Having this knowledge, it is in the same situation as the Pacific Southwest Bank with respect to all money deposited in it after the trust became operative. The moment the trust came into being, all deposits previously made, and which remained in the bank thereafter, as well as all deposits subsequently made by Foley, or to his account, or on account of the E. Y. Foley or E. Y. Foley, Inc., business, were impressed with the trust, and became special or trust deposits for particular and specific purposes, and not general deposits, which the bank could appropriate by charging these deposits with claims the banks held against the Foley business.

Since the submission of these actions the Supreme Court of the United States has rendered a decision which to my mind is decisive of these suits, as far as the banks' right of set-off is concerned, enunciating principles that are peculiarly applicable to the facts which this court has found in these suits. In United States v. Butterworth-Judson Corporation, 267 U. S. 387, 45 S. Ct. 338, 69 L. Ed. 672, the Supreme Court said:

"But a bank, having notice that a deposit is held by one for the use of or as security for another, has only such right of set-off as is not inconsistent with the rights of the latter. Here the banks had knowledge of the agreements, under which these balances constituted security for the advance made by the United States. By acceptance of the moneys furnished in accordance with the agreement, their right of set-off was made subject to the rights of the United States and the obligations of the contractor."

The same reasons and authorities that preclude the right of the defendant banks to offset the deposits in the respective accounts with obligations to the bank of E. Y. Foley and/or E. Y. Foley, Inc., prevent the banks from asserting rights to such deposits under the banker's lien law of California. There are also other reasons why no banker's lien exists in these cases. Section 3054 of the California Civil Code, while imposing a specific statutory lien upon all property of a customer in the possession of a bank for balances due to the banker from the customer in the course of business, does so only upon the property of the customer. The lien cannot extend to property wherein

the bank has notice or knowledge that such belongs to others than the customer. In these cases the customer was E. Y. Foley, or E. Y. Foley, Inc., and each bank had notice and knew that, as to all of the property of either and both, the beneficial owners were the creditors, and that the customers sui juris had no definite existing property at the time the set-offs were made. The deposits whereon the banker's lien is asserted were known by the banks to be impressed with preferred liens, which the banks could not subordinate. These preferred liens arose out of the agreements of January, February and March, 1923. Berry v. Bank of Bakersfield, 177 Cal. 206, 170 P. 415; Keeney v. Bank of Italy, 33 Cal. App. 515, 165 P. 735; American Surety Co. v. Bank of Italy, 63 Cal. App. 149, 218 P. 466.

I conclude the main question in these cases by holding that, as between the plaintiff-trustee in bankruptcy and each defendant bank, all of the money sued for should be delivered to the plaintiff for administration and distribution in accordance with the National Bankruptcy Law, and that each bank may enlarge, modify, or file claims against the proper bankrupt estates for the amounts of their claims, respectively, affected by this decision.

It having been determined that all of the moneys in the deposits in the two defendant banks are impressed with a trust, and that the banks have no right to withhold these moneys from the trustee in bankruptcy, we are brought to a consideration of the issues between plaintiff and defendant Lynes. Lynes, an Eastern contributing creditor to the $200,000 fund, for himself and on behalf of other Eastern contributing creditors to said fund, by cross-complaint against plaintiff and Pacific Southwest Bank, asks that this court decree that the sums appropriated by the defendant Pacific Southwest Bank from the trust fund deposited in said bank rightfully belong to the creditors who contributed to said trust fund in proportion to their contributions, and that the amounts advanced through Lynes, as trustee, for others as well as himself, to the extent of the proportionate amount of their contributions, be ordered to be paid over to him as trustee, and that it be further decreed that the repayment of said advancements have priority and precedence over the payment of other creditors of the bankrupt estates, and that the amounts so advanced be declared to be a lien upon the assets of said estates, and a sufficiency of said assets be sold or converted

into cash to repay said advancements. Defendant Lynes also raises other issues by cross-complaint against plaintiff, which by stipulation have been withdrawn from consideration by the court at this time.

The claim of Lynes in substance is that all contributions to the $200,000 fund were made under an express bargain and binding agreement between E. Y. Foley, E. Y. Foley, Inc., and all of the creditors of each, that the repayment of the contributions would be secured and have priority over other creditors. I have failed to find any evidence in the voluminous record of these suits which refutes this claim. The early negotiations, after Foley's financial embarrassment became known to his creditors in December, 1922, as well as the terms of the three agreements under which these contributions were brought about and made, and all of the conferences and correspondence between the creditors of Foley, or E. Y. Foley, Inc., lead me to the irresistible conclusion that the claim of Lynes is irrefutable.

But the plaintiff says that, conceding that the contributors of the $200,000 special fund have a preferred lien upon all of the property of both bankrupt estates to secure repayment of their contributions to this special fund, still the lien is unenforceable in law as against the trustee in bankruptcy, because of the failure to record the trust agreement of January 26, 1923, or either of the two subsequent contributors' agreements of February 19 and March 14, 1923.

Section 67a of the National Bankruptcy Act of 1898 provides: "Claims which for want of record or for other reasons would not have been valid liens as against the claims of the creditors of the bankrupt shall not be liens against his estate." Comp. St. § 9651.

And section 47a of the same act, as amended in 1910, contains, inter alia, the following clause: " * * * And such trustees, as to all property in the custody or coming into the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a creditor holding a lien by legal or equitable proceedings thereon; and also, as to all property not in the custody of the bankruptcy court, shall be deemed vested with all the rights, remedies, and powers of a judgment creditor holding an execution duly returned unsatisfied."

[8] It becomes necessary first to consider and determine whether the money in suit falls within either classes of property that

are described in the 1910 amendment to section 47a. The $57,988.41 now on deposit in the Pacific Southwest Bank in "E. Y. Foley, Inc., Special Account A" is in an entirely different category than any of the other deposits in controversy. The entire fund or deposit, of which this $57,988.41 is the balance, was solicited and contributed for a specific purpose. It was segregated, set apart, and reserved from the general assets or funds of the trust concerning the business of E. Y. Foley and E. Y. Foley, Inc. It was placed in the bank as a separate and specially designated account, upon which no general checks concerning the business of E. Y. Foley or E. Y. Foley, Inc., could be or were drawn. All disbursements from this special trust fund went to pay 25 per cent. of the growers' claims against the business of E. Y. Foley.

Every creditor of E. Y. Foley, or E. Y. Foley, Inc., that had a claim against the Foley business at the time this special contribution of $200,000 was made by certain creditors, had knowledge or notice of its special status, and all subsequent creditors who may have dealt with the trust executed through E. Y. Foley, Inc., could not contend that they in any way relied upon or extended credit by reason of this "E. Y. Foley, Inc., Special Account A." The contributors of this money never divested themselves of the right to control its uses. There was never any transfer of this $200,000 to the Foley trustees, which operated to render this money or fund an asset of E. Y. Foley, Inc., which upon bankruptcy inured to the benefit of the estate of either bankrupt. This fund and these moneys were always impressed with an equitable lien, beneficial only to those who contributed the money, and this fund and money being a trust for a distinctive purpose, which having failed, the remnant of the fund does not become a part of either bankrupt estate, so as to subject it to the claims of general creditors.

The fact that notes of E. Y. Foley, Inc., were given to the contributors of this fund for their respective contributions thereto did not, in my opinion, transform these transactions into pure loans to the corporation. The execution of such notes by the corporate trustee, and their acceptance by the contributors, merely gave additional security to the contributors for the repayment of their advancements to the trust under the original agreements. The original agreements, as well as the correspondence attending the transmittal and receipt of these contribu-

tions, unmistakably impress this fund of $200,000 with trust features that are not effaced because notes were given as additional assurances of repayment.

It is my belief that what remains of this fund or deposit is trust money, which the Pacific Southwest Bank holds for the contributors to the $200,000 fund in proportion to their contributions thereto. The provisions of the 1910 amendment to section 47a of the National Bankruptcy Act are wholly inapplicable to this money, and it follows that the statutes of California relative to recording documents and priority of liens have no application to this $57,988.41.

[9] All the other deposits in controversy in the banks belong to or are a part of the general trust of the business of E. Y. Foley, carried on primarily by personal trustees, and finally, until bankruptcy, by E. Y. Foley, Inc., a corporation, and all of such deposits are governed by sections 47 and 67 of the National Bankruptcy Law, construed and applied in conformity to the laws of California relating to recording requirements of liens. The state law controls as to what rights a lien or execution creditor of E. Y. Foley, or E. Y. Foley, Inc., would have as against Lynes and the other contributing creditors. Such is the uniformly established rule. 2 Collier on Bankruptcy (13th Ed.) pp. 1058 and 1507, and cases cited therein.

Section 1214 of the California Civil Code provides: "Every conveyance of real property, other than a lease for a term not exceeding one year, is void as against any subsequent purchaser or mortgagee of the same property, or any part thereof, in good faith and for a valuable consideration, whose conveyance is first duly recorded, and as against any judgment affecting the title, unless such conveyance shall have been duly recorded prior to the record of notice of action."

And section 1215 of the same Code reads: "The term 'conveyance,' as used in sections twelve hundred and thirteen and twelve hundred and fourteen, embraces every instrument in writing by which any estate or interest in real property is created, aliened, mortgaged, or encumbered, or by which the title to any real property may be affected, except wills."

The filing of a petition in bankruptcy is a caveat to all the world, and in effect an attachment and injunction. Mueller v. Nugent, 184 U. S. 1, 22 S. Ct. 269, 46 L. Ed. 405; In re Flatland, 196 F. 312, 116 C. C. A. 130. The plaintiff on September 13, 1923, became "vested with all the rights, remedies

and powers" given by the laws of California to "a creditor holding a lien" by legal or equitable proceedings upon all of the Foley property and interests, whether held by E. Y. Foley or E. Y. Foley, Inc., a corporation.

[10] It is conceded that neither the trust agreement of January 26th nor either of the two subsequent contributing creditors' agreements, under which Lynes and his codefendants claim a lien or interest in all of the Foley properties, were ever recorded. These instruments are conveyances under the Code sections of California above cited, and, although these instruments are sufficient and effective to transfer all of the Foley properties, so as to impress them all with a preferred lien or interest, beneficial solely to the contributors of the $200,000 fund, in order to secure preferential repayment of their advances, they are subordinate and inferior to the title of the plaintiff, as trustee in bankruptcy, because, not having been recorded when the lien of the plaintiff trustee in bankruptcy attached to all of the properties of E. Y. Foley and E. Y. Foley, Inc., a corporation, these contributing creditors' liens must be subordinated to the rights vested in plaintiff as trustee for the two bankrupt estates.

The rights of plaintiff as "a judgment creditor holding a lien by legal and equitable proceedings," as well as through an "execution duly returned unsatisfied," extend to all of the Foley property, whether held by E. Y. Foley or E. Y. Foley, Inc., and these rights are derived from the law itself (section 47, National Bankruptcy Law), and not from any particular creditor. In other words, it was not necessary that any particular creditor of the Foley business in fact had a judgment against E. Y. Foley or E. Y. Foley, Inc., on September 13, 1923, in order that the plaintiff could assert and enforce "all the rights, remedies and powers" conferred by the law. In re Farmers' Cooperative Co. (D. C.) 202 F. 1008; In re Pittsburg, etc., Co., 215 F. 703, 132 C. C. A. 81.

[11] The verbiage, "vested with all the rights, remedies and powers" of a judgment creditor, does not mean "the rights, remedies and powers" of a judgment creditor who would not have been entitled under the statutes of California (section 409, Code of Civil Procedure) to file a lis pendens, but includes such a judgment creditor. There can be no doubt that the filing of the petition in bankruptcy on September 13, 1923, was a proceeding that affected the title to all of the property of E. Y. Foley and/or E. Y. Foley, Inc., or that such filing operated as a lis pendens under the laws of California. Neither can there be any doubt that plaintiff, by virtue of the filing of the petition in bankruptcy, was thereby vested with all the rights of a judgment creditor who had properly filed a lis pendens under the laws of California. It must follow, therefore, that the claim or lien of Lynes and the other contributing creditors being based (as to all deposits other than "E. Y. Foley, Inc., Special Account A") upon "conveyances" which were not recorded on September 13, 1923, when the equivalent of a lis pendens was filed by plaintiff, all rights under such "conveyances" are subordinate and inferior to those of plaintiff. 16 California Jurisprudence, 662.

[12] The only issues remaining for decision are those between the plaintiff trustee in bankruptcy and defendants Pruner and Tarpey. These two defendants are grower creditors of Foley, and each of them had signed the agreements under which grower creditors agreed to accept 25 per cent. of their claims in cash, to be paid out of the fund contributed by creditors and deposited in "E. Y. Foley, Inc., Special Account A," in the Pacific Southwest Bank, and in consideration of such payment these two grower creditors, as did the other grower creditors, agreed to forbear the balance of their claims and to accept notes and/or preferred stock in the corporation therefor. The total amount of Pruner's claim was $28,000, and the total amount of the claim of Tarpey was something in excess of $5,000. Under date of August 28, 1923, a check for $7,000 was regularly drawn by the corporate trustee on "E. Y. Foley, Inc., Special Account A," in favor of defendant Pruner; and under date of August 15, 1923, a check was similarly drawn in favor of defendant Tarpey for $1,334.94, being 25 per cent. of his claim. These checks were in due course presented by the payees to the Pacific Southwest Bank and payment of each was refused; the bank having attempted to exercise a right of set-off as to "E. Y. Foley, Inc., Special Account A," by reason of obligations of E. Y. Foley, Inc., to the bank.

In view of the court's determination of the status and character of this "E. Y. Foley, Inc., Special Account A," and that the Pacific Southwest Bank has no right to retain the money deposited therein, the ultimate question for decision is whether, con-

sidering the transactions and circumstances, these two defendants are entitled to be paid the respective amounts of the two checks before the trustee in bankruptcy receives this special deposit for the benefit of the contributing creditors, who advanced this money for the benefit of the trust concerning E. Y. Foley's business. In my opinion, defendants Pruner and Tarpey are entitled to the moneys, respectively, under the doctrine of equitable assignments. 3 California Jurisprudence, 261; Goldman v. Murray, 164 Cal. 419, 129 P. 462.

It is clear, from the evidence in this suit, that it was the intention of all parties concerned that title to a portion of this trust fund deposited in "E. Y. Foley, Inc., Special Account A" was to pass to Pruner and Tarpey for the respective amounts of the checks or orders which were given to them, and which in and of themselves must be held under the law to be assignments pro tanto of this special trust deposit. The situation shown by the record in this case is not similar to those shown in 4 California Jurisprudence, 244, or in the cases cited under note 19 therein; these deposits being trust and special funds, wherein the ordinary relation of debtor and creditor did not exist between the bank and the depositor.

I conclude this statement by summarizing the decision in these suits as follows: The defendant banks are not entitled to withhold any part of the moneys sued for, and are ordered to deliver all of such moneys to the trustee in bankruptcy; and said trustee in bankruptcy is ordered to pay and deliver to the contributing creditors, proportionately to the amount of their contributions and to the exclusion of the general creditors, the amount remaining in "E. Y. Foley, Inc., Special Account A," after deducting therefrom the amounts of the Pruner and Tarpey checks, respectively, which said amounts are ordered paid to said defendants Pruner and Tarpey, and the entire balance of the moneys sued for herein is to be distributed by plaintiff trustee in bankruptcy to the general creditors of the estates of said bankrupts in accordance with the National Bankruptcy Law.

Solicitor for plaintiff will prepare and present a decree in accordance with the views expressed herein, under the rules of this court.

### Supplemental Opinion.

The question as to the right of plaintiff to recover interest herein was not raised at the time of the trial of these cases, and was not discussed in the briefs, and was not considered by the court in its written decision heretofore filed herein. The plaintiff now moves that the court, in addition to its award in accordance with its previously filed written conclusions, allow interest on the respective amounts found to be due from the defendant banks from the dates of the demands of the plaintiff on the respective banks. The defendants object to such awards of interest on the grounds among others, that there is no specific demand for interest in the complaints, and that, in view of the peculiar circumstances of these cases, the court is not justified in assessing additional damages on the defendant banks.

I feel that the objections are meritorious. Inasmuch as the statutes of California relating to the allowance of interest in civil actions are not binding upon United States courts when sitting in equity, I feel that the proper exercise of discretion, in view of all the circumstances of these cases, does not justify the imposition of any interest upon the defendant banks. I feel that the assertion of lien and right of set-off by the defendant banks was in good faith. Moreover, there was no definite contract to pay interest upon any of the deposits or accounts in controversy, and no bad faith, misconduct, fraud, or unreasonable delay has been shown on the part of either of the defendant banks. To allow interest to the trustee in bankruptcy under such circumstances would be inequitable, and an unjustifiable hardship on the defendant banks.

For these reasons, the motion of plaintiff for interest will be denied, and the decree will be against each bank in accordance with the previously written conclusions of the court filed herein, and pursuant to the oral statements from the bench at the time of the hearing of this motion.