# UNITED STATES ET AL. *v.* BUTTERWORTH-JUDSON CORPORATION ET AL.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 338. Argued December 9, 10, 1924.—Decided March 2, 1925.

1. Under the Act of October 6, 1917, § 5, c. 79, 40 Stat. 383, the Secretary of War was authorized to advance money to a contractor for carrying out a contract for producing and furnishing supplies of picric acid to the War Department and could provide the "adequate security" called for by the act by requiring the balances of the advanced funds be kept in special deposits subject to a lien in favor of the Government, in addition to requiring a collateral note of the contractor and surety bond. P. 392.

2. Under a contract for the erection of a plant, and manufacture and delivery to the Government of picric acid, the Government advanced the contractor moneys, to be deposited at interest in special bank accounts separate from the contractor's other funds, such money to be drawn on only for specified purposes, and the balance thereof to be accounted for to the Government, either by deliveries of the acid at a specified price or by return of the amount, less authorized deductions, *Held,* (assuming that the title passed, establishing the relation of debtor and creditor,) that the purpose and effect of the special accounts were to provide security for the United States and that an equitable lien upon them existed in its favor, although not expressly reserved in the agreement. P. 393.

3. An equitable lien reserved by the United States as security for the proper use or return of funds advanced to a contractor, which under the agreement were deposited in special bank accounts for the purpose of providing such security,—*held* superior to the right of the banks (they having notice of the agreement,) to set off such deposits against debts owed them by the contractor. P. 394.

297 Fed. 971, reversed.

APPEAL from a decree of the Circuit Court of Appeals affirming a decree of the District Court which dismissed, as to defendant banks, a suit brought by the United

States against the Butterworth-Judson Corporation and its receivers, the banks and several surety companies. The bill sought an accounting under a contract between the first named defendant and the United States, and to apply the balances of special deposits made by the contractor with the banks to the amount found due under the contract—also a decree for any deficiency against the surety companies on bonds furnished by the contractor. The contractor, receivers and surety companies answered and also filed counter claims against the banks, seeking to have the special account deposits paid over to the United States. The banks' motions to dismiss the bill and counter claims were sustained by the courts below.

*Mr. William Marshall Bullitt,* with whom *Mr. Solicitor General Beck* and *Mr. Victor House,* Special Assistant to the Attorney General, were on the brief, for the appellants.

*Mr. William C. Breed,* with whom *Mr. Edward J. Redington* was on the brief, for National Newark & Essex Banking Company of Newark, N. J.

*Mr. David Paine,* with whom *Mr. Michael H. Cardozo, Jr.,* was on the brief, for Chase National Bank, et al.

MR. JUSTICE BUTLER delivered the opinion of the Court.

The United States, plaintiff below, and certain surety companies, defendants below, appeal from a decree of the Circuit Court of Appeals, 297 Fed. 971, affirming that of the District Court dismissing the complaint as to certain banks, defendants below, and dismissing counter-claims set up against the banks in the answers of the surety companies. The decree also dismissed counter-claims against the banks, set up in the answer of the

Butterworth-Judson Corporation and its receivers, defendants below. They have not appealed.

The controversy concerns the right of the banks, as against appellants, to set off against debts owing to them by the Butterworth-Judson Corporation the deposit balances remaining with them in special accounts.

The Butterworth-Judson Corporation, a contractor, and the United States made an agreement, dated May 9, 1918. The contractor agreed to select a site and, for a profit of one dollar and no more, to design, construct and equip thereon a plant for the production of picric acid, and to manufacture for the United States 72,000,000 pounds for 53 cents per pound. The entire cost of the plant was to be paid by the United States. The contractor was to make all necessary expenditures for the construction work, and the United States from time to time was to reimburse it therefor. The United States agreed to recommend to the War Credits Broad an advance payment to the contractor of $1,500,000, upon such terms as the board might prescribe; and also agreed that, if the board should require interest on the advance payment, it would reimburse the contractor as a part of the cost and expense of the latter under the contract. The United States reserved the right to cancel the agreement at any time that its need for the plant or output ceased. It agreed in such event to reimburse the contractor for its expenditures, to assume all its outstanding obligations incurred under the contract, and to pay for all the picric acid wholly or partly manufactured; and it agreed, in case of cancelation before 18,000,000 pounds were delivered, to pay three cents per pound for the undelivered portion up to that amount.

The same parties made a supplementary agreement, dated May 22, 1918. The United States agreed to advance $1,500,000 to the contractor. The contractor agreed to account for the advance with interest, by applying that

amount to the payment of vouchers covering deliveries
of picric acid. The contractor reserved the right at any
time to repay in cash. If the United States did not re-
coup, through the deliveries of picric acid, the total
amount of the advance with interest, the contractor was
required to " return to the Government, on demand, any
balance of the said advance and interest after deducting
the total of any recoupments made as hereinabove pro-
vided, together with all liquidated accounts that may be
due and owing under the Principal Agreement from the
Government to the contractor." The contractor agreed
to give the United States, as collateral security for the
recoupment or return of the above mentioned advance
and any interest due, its demand note for $1,500,000,
bearing six per cent. interest, and to furnish a bond in the
sum of $750,000, with surety, for the performance of the
agreement. The United States reserved the right, in case
of failure of the contractor to comply with the agreement,
to sell the note and apply the proceeds to the repayment
of the advance, accounting to the contractor for the sur-
plus, if any. But it agreed not to negotiate or demand
payment of the note, so long as the contractor was not in
default, and to return the note and bond upon complete
performance. And the agreement contained the follow-
ing: " The contractor shall deposit the money advanced
hereunder in special accounts in banks, separate from its
other funds, and shall draw on said accounts only in pay-
ment of expenditures made and obligations incurred in
designing, constructing and equipping the plant specified
in the Principal Agreement, and for other equipment and
for material, labor and overhead expense, required in the
direct performance of the Principal Agreement, unless
otherwise authorized in writing by the War Credits
Board." It was stipulated that the contracting officer
might require the contractor to deposit in the special ac-
counts the funds paid by the Government, reimbursing

the contractor for expenditures made from such advance payment. The contractor was to collect from the banks with which such accounts were kept such interest as is usually allowed for similar accounts, and credit or pay that interest to the Government.

The bonds provided for in the principal and supplementary agreements were furnished. The United States advanced $1,500,000 to the contractor, and the latter gave its note as agreed. The contractor deposited the money with defendant banks in special accounts, and entered upon the performance of the agreement. It made withdrawals from these accounts for the specified purposes, and from time to time deposited therein the sums paid to it by the United States in reimbursement of its expenditures. The banks at all times knew that the moneys deposited by the contractor in the special accounts consisted exclusively of the advance payment and replenishments, and that all deposits and balances in these accounts were held pursuant to the principal and supplementary agreements. Shortly after the Armistice, the plant being less than half completed, the United States terminated the principal agreement. No picric acid had been manufactured. The United States reimbursed the contractor and assumed all the latter's obligations under the principal agreement. It was shown in a creditors' suit in the District Court that the contractor was unable to pay its debts, and April 22, 1922, the court appointed receivers who are defendants in this case. Neither the contractor nor its receivers accounted to the United States for any part of the advance of $1,500,000 or interest, except $348,-550, leaving unaccounted for, as the United States claims, $1,151,450. The total of the balances in the special accounts on April 22, 1922, was $519,631.99. On that day, the contractor was indebted to each of the banks in an amount in excess of the balance in the special account with it, and each bank set off the amount of such deposit against the debt owed by the contractor.

The suit was 'for an accounting and to have the balances in the special accounts applied on the amount found unaccounted for and due the United States on the settlement of the account between it and the contractor. In affirming the District Court, the Circuit Court of Appeals held that the advance payment was for supplies purchased and thereafter to be delivered, and that the Secretary of War had no authority to retain title to the moneys advanced and make the contractor agent of the United States for its disbursement; that the supplementary agreement created no relation of trust or agency between the parties, but only that of debtor and creditor. It held that the doctrine of trust, or equitable lien, or equitable assignment, did not apply, and that the banks had the right of set-off. The appellants maintain that the United States had an equitable lien on the balances in the special accounts, and that the banks, having notice of the lien, could not set off the deposits against the debts owed them by the contractor.

The advance payment was made under the authority of an act of Congress of October 6, 1917, § 5, c. 79, 40 Stat. 383, which provides: " That the Secretary of War and the Secretary of the Navy are authorized, during the period of the existing emergency, from appropriations available therefor to advance payments to contractors for supplies for their respective departments in amounts not exceeding thirty per centum of the contract price of such supplies: *Provided,* That such advances shall be made upon such terms as the Secretary of War and the Secretary of the Navy, respectively, shall prescribe and they shall require adequate security for the protection of the Government for the payments so made." The act was intended to relax, during the period of the war, the strict rule against advances of public money. See R. S. § 3648. *The Floyd Acceptances,* 7 Wall. 666. The act plainly authorized advance payments, such as that covered by

the supplementary agreement. It left the terms to the discretion of the Secretary of War, subject to the duty to require adequate security, but the act did not specify or limit the amount or kinds of security to be taken. A lien upon and right over the balances in the special accounts required to be kept is clearly within the meaning of the word " security," as used in the act. The power of the Secretary to exact such a lien or right in addition to the collateral note and surety bond cannot be doubted.

The agreements made the balances in the special accounts security for the obligations of the contractor and so created an equitable lien in favor of the United States.

The established rule as to the creation of equitable liens is stated in *Walker* v. *Brown,* 165 U. S. 654, 664: " The doctrine may be stated in its most general form that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees and purchasers or encumbrancers with notice." See also *Hauselt* v. *Harrison,* 105 U. S. 401, 405; *Ingersoll* v. *Coram,* 211 U. S. 335, 368; Pomeroy's Equity Jurisprudence (4th ed.) §§ 1233, 1234, 1235. It may be assumed that the United States did not retain title to the advance payment, and that when it was made it became the property of the contractor, and also that the contract contemplated that the relation of debtor and creditor might arise. The contractor's obligation, subject to its right at any time to repay the Government in cash,

was to account for the amount of the advance with interest, by deliveries of the picric acid at the agreed price, or to return that amount to the United States, after making the authorized deductions, if any. The contractor's note and the surety bond were given to secure performance of the agreement. And the requirement that the contractor deposit the money in special accounts in banks, separate from its other funds, and collect and account for interest on deposit balances, and draw on such accounts only for the purposes specified and return the balance of the advances, was additional security. It was to make more certain the performance of the agreement. The purpose and effect of the special accounts was to identify and keep separate the advance payment and replenishments, to limit the use of the fund to the purposes specified, and so to make it available as security to the United States. Failure of the agreement expressly to grant a lien on or declare these balances to be additional security is not significant. See *Barnes* v. *Alexander,* 232 U. S. 117, 121. The Armistice came, and the United States terminated the agreement before there was any production at the plant. The advance and replenishments were not wholly expended, or accounted for by deliveries of picric acid. The contractor was bound to " return " and the United States was entitled to demand and have " any balance of the said advance " remaining after the deductions authorized. The agreements show that the parties contemplated that the need for picric acid might cease before the advance payment was covered by deliveries; and bound the contractor, in that event, to return the balances in the special accounts to the United States. This case is plainly within the rule.

Ordinarily, the relation existing between banks and their depositors is that of debtor and creditor, out of which the right of set-off arises. As a general rule, in the

absence of an agreement to the contrary, a deposit, not made specifically applicable to some other purpose, may be applied by the bank in payment of the indebtedness of the depositor. See *Studley* v. *Boylston Bank*, 229, U. S. 523, 528; *New York County Bank* v. *Massey*, 192 U. S. 138, 145; *National Mahaiwe Bank* v. *Peck*, 127 Mass. 298, 300. But a bank having notice that a deposit is held by one for the use of or as security for another has only such right of set-off as is not inconsistent with the rights of the latter. Here, the banks had knowledge of the agreements, under which these balances constituted security for the advance made by the United States. By acceptance of the moneys furnished in accordance with the agreement, their right of set-off was made subject to the rights of the United States and the obligations of the contractor. See *National Bank* v. *Insurance Co.*, 104 U. S. 54, 71; *Union Stock Yards Bank* v. *Gillespie*, 137 U. S. 411, 421; *Boyle* v. *Northwestern National Bank*, 125 Wis. 498, 507. The appropriation of these balances by the banks cannot be sustained.

*Decree reversed.*