### In re CUMMINS CONST. CORPORATION.
#### No. 9876.

District Court, D. Maryland.

May 21, 1947.

410

Frederick J. Singley and Charles G. Page, both of Baltimore, Md., for trustee.

Nathan Patz and Irving B. Grandberg, both of Baltimore, Md., for petitioning creditors.

COLEMAN, District Judge.

This matter is now before the Court on a petition of the General Supply & Equipment Company and Joseph F. Hughes & Company, two general creditors of Cummins Construction Corporation, the bankrupt, to review and set aside an order of the Referee dated September 20, 1946, which ratified the acceptance by the trustee in bankruptcy of a certain offer of settlement made by certain creditors of the bankrupt, as hereinafter explained.

The material facts giving rise to the present controversy, which are not disputed, may be summarized as follows, taken from the petition of the trustee whereby he sought ratification of his acceptance of the offer of settlement, and from the findings of the Referee.

On October 16, 1944, the Cummins Construction Corporation, the bankrupt, was indebted to the Baltimore National Bank, Baltimore, in the amount of $70,000 as evidenced by three notes, one of which, for $25,000, was due on that day, and the other two in the course of the same month. The bankrupt had to its credit in this Bank in checking accounts in its name, the sum of $14,628.76. On that same date, the bankrupt was indebted to the First National Bank, Baltimore, in the sum of $125,000, evidenced by four demand notes, and the bankrupt had to its credit in this Bank in checking accounts carried in its name, the sum of $53,886.29. All of these notes held by the two banks were indorsed by officers or directors, or both, of the bankrupt corporation. The corporation's balance sheet given to the banks showed it

to be then insolvent, due, in large part, to the fact that certain claims of the bankrupt against the Government had been disallowed. Thereupon, both banks acted immediately to apply the corporation's funds on deposit towards liquidation of its indebtedness to them, the First National Bank calling its demand notes.

During the year 1942, the bankrupt, and also a Baltimore firm, Riggs Distler & Company, Inc., contractors and engineers, had entered into a joint undertaking with the United States Government to do certain construction work at Cedar Point, Maryland, and in order to obtain necessary funds, both companies entered into a formal loan agreement with the Baltimore National Bank, and assigned to it, as security for this loan, such amounts, equal to the loan, as would be due to them from the Government on this project. In 1943, the Government terminated this project contract, and prior to September 4, 1944, both companies had paid the bank the full amounts they had borrowed for this project. Thus, the assignment to the bank of Government payments under this project was impliedly terminated. However, this assignment had never been formally revoked when, on December 6, 1944, the bank received another check from the Treasurer of the United States, payable to its order, as assignee, in the sum of $45,103.73, being the proceeds of certain amounts finally cleared for payment by the Government on this project. Upon receipt of this check, the bank cashed it, and after delivering one-half of the proceeds to Riggs Distler & Company, Inc., the joint contractor, applied the other half, namely $22,551.86, against the bankrupt's indebtedness to it.

On December 8, 1944, the two banks entered into an agreement with Charles A. Cummins, a director of the bankrupt corporation and one of the indorsers on the notes held by the banks, and also with his wife, whereby the sum of $86,000 was paid by Mr. and Mrs. Cummins in exchange for a release of this indebtedness by the banks given to all the guarantors on the notes, it being part of this agreement of release that any collections by the banks from the estate of the bankrupt, in excess of the remainder of the indebtedness due by the bankrupt to the banks after crediting the $86,000 and interest, should be paid to Charles A. Cummins and his wife.

On January 4, 1945, the Cummins Construction Corporation was adjudicated a bankrupt. The Baltimore National Bank filed a claim as an unsecured creditor of the bankrupt for $33,381.16, being the balance, with interest to the date of bankruptcy, remaining due on the bankrupt's notes held by it after making the above offsets. The First National Bank also filed a claim in the amount of $72,401.95, being the balance due on the bankrupt's notes which it held after making the aforementioned offsets.

On June 3, 1946, the trustee in bankruptcy made demand upon the Baltimore National Bank for restoration of the sum of $22,551.86 received from the Government pursuant to the assignment as above explained, this demand being based on the ground that the application of this amount of the bankrupt's indebtedness to the Bank was a voidable preference under the Bankruptcy Act. At the same time, the trustee in bankruptcy raised the further questions (1) whether, by applying towards liquidation of the bankrupt's indebtedness to them, the deposits in the bankrupt's name in its checking accounts, the two banks did not create voidable preferences under the Bankruptcy Act; and (2) whether the individual indorsers of the bankrupt's notes held by the two banks had not been likewise preferred, contrary to the provisions of the Bankruptcy Act, to the extent of such application of these deposits.

The position taken by both banks, and also by the indorsers of the bankrupt's notes held by the banks, was that no voidable preferences occurred. Negotiations followed between all the parties looking towards a settlement of their differences, with the result that, in order to avoid litigation, under date of August 2, 1946, the trustee in bankruptcy received from both banks, and the indorsers of the notes, an offer to pay the bankrupt, in final compromise and settlement of all claims against them by the trustee on account of

the transactions which we have above set forth, the sum of $22,551.86, namely, the amount of the Government's remittance received by the Baltimore National Bank on December 6, 1944, which the bank had set-off against the bankrupt's indebtedness to it. In other words, under the proposal, the bankrupt estate was to receive the sum of $22,551.86; no further claim of preference was to be made against either the banks or the indorsers on the bankrupt's notes which the banks held; and the general claims of the respective parties against the bankrupt estate were to be amended to include the amount of this proposed payment.

The trustee in bankruptcy, upon the advice of his counsel, decided that the acceptance of this compromise offer was for the best interest of the bankrupt estate and, accordingly, accepted it, subject to the approval of the Court, after notice to creditors in accordance with the provisions of the Bankruptcy Act. The trustee petitioned the Court to ratify his action, whereupon the Referee issued an order requiring the creditors to show cause, if any they had, at a stated meeting, why this offer of compromise should not be ratified and confirmed. The hearing was duly held; it was agreed that the testimony previously taken, in the course of examinations before the Referee, of the officers of the bankrupt corporation should be considered for the purposes of determining what action should be taken with respect to ratification of the offer of compromise. The matter was fully argued by the attorneys for the trustee in bankruptcy and for certain objecting creditors, including those who have petitioned for the present review of the Referee's action in ratifying the trustee's acceptance of the offer of compromise.

The petition of the objecting creditors for a review by this Court of the Referee's order is based upon three major grounds: (1) that the only parties involved in the compromise settlement, in so far as the bankruptcy estate is concerned, are the trustee in bankruptcy and the Baltimore National Bank, and that, therefore, the addition of the other parties to the compromise settlement created a disadvantage to the bankruptcy estate, and no consideration has moved from such parties to the trustee in bankruptcy entitling them to a release of any claims against them arising out of transactions affecting the bankruptcy; (2) that the trustee in bankruptcy has a claim for the recovery of voidable preferences against the various indorsers on the bankrupt's notes held by the banks; that these indorsers received benefits by the reduction of their guaranty liability, by reason of transfer of funds to the banks on the bankrupt's accounts immediately prior to bankruptcy, and that, by the Referee's order ratifying the compromise settlement, these indorsers will be fully relieved of any liability under their guaranty without any consideration therefor; and (3) that the Baltimore National Bank was never entitled to retain any part of the sum of $22,551.86 to be paid to the trustee pursuant to the compromise settlement; the trustee being entitled to receive this amount from the Bank without any conditions being attached thereto.

Stated in more succinct form, the objecting creditors' petition for review of the Referee's action presents these three questions: (1) If a bank, in the ordinary course of business, receives deposits from a depositor before and during four months next preceding such depositor's adjudication in bankruptcy, and during such four month period, with notice that the depositor is in financial difficulties, applies his deposits against indebtedness due by the depositor to it, has the bank thereby received a voidable preference; (2) even if question No. (1) be answered in the negative, do, nevertheless, the indorsers on such depositor's notes to the bank receive a voidable preference by the application of the bankrupt's deposits as set forth in question No. (1); and (3) did the Baltimore National Bank's application to the bankrupt's indebtedness to that bank of the sum of $22,551.86, which it received from the United States Government by virtue of the bankrupt's assignment, constitute a voidable preference?

In order to answer these questions correctly, it is necessary to analyze the precise effect of the compromise settlement upon the various parties involved. That

effect is as follows: First, as between the trustee in bankruptcy and the banks: The trustee gives up his claim of $68,515.05 (the amount of the deposits). The Baltimore National Bank gives up $22,551.86 and any other sums which may be paid by the Government. The other bank gives up nothing. Second, as between the trustee and the indorsers: the trustee gives up his claim of $68,515.05, representing the deposits, against the indorsers. They, in effect, give up $22,551.86 and any other sums which may be paid by the Government, because if the bank is not required to pay over this amount to the trustee, then to the extent of that amount, the bank would have been paid off and the indorsers would not be required to indemnify the bank.

As already explained, the position taken by the objecting creditors is first, that the trustee should have sued the Baltimore National Bank to recover the $22,551.86, on the ground that the bank had no just claim for retaining this sum or any part of it, since at the time it was received, the notes, for which the assignment to the bank of Government funds was given as security, had been fully paid; and that, therefore, with respect to this payment, the bank was required to hold it as in the nature of a special fund for the benefit of the bankrupt. Next, it is the position of the objecting creditors that the trustee should have sued the guarantors to recover the sum of $68,515.06,—the amount of the deposits applied by the banks to the bankrupt's indebtedness to them,—and that by not doing so, the guarantors got a preference through these set-offs by the banks, because these set-offs were against loans on which the indorsers were secondarily liable. That is to say, the objecting creditors argue that if suit were brought against the indorsers it could be developed that their conduct, as officials or directors of the bankrupt corporation in making deposits in the banks as and when they did, was a transfer in fraud of other creditors. In short, the objecting creditors claim that litigation by the trustee would result in the bankruptcy estate recovering $91,066.91 as follows: $53,886.29, the amount of deposits which the First

National Bank applied as a set-off to the bankrupt's indebtedness to it; $14,628.76, which the Baltimore National Bank applied in a similar manner; and the $22,551.86 paid on the assignment of Government funds, instead of receiving merely the latter sum, as the trustee would do by the compromise settlement.

On the other hand, the position taken by the trustee in bankruptcy is as follows: First, he also claims that the Baltimore National Bank had no legal justification for retaining the $22,551.86; second, he believes, however, that the banks have not violated the Bankruptcy Act in retaining the $68,515.05 of deposits; and third, it is his position that if he had sued the indorsers for this $68,515.05, he could not have recovered any part of it because of lack of evidence of any fraud, collusion or bad faith on the part of any of the indorsers. Therefore, he concluded that, in the exercise of sound discretion and on advice of counsel, it was to the best interest of all the creditors of the bankrupt estate whom he by law represents, to accept the compromise offer and obtain the $22,551.86 and such other sums as might still be payable by the Government, thereby preserving for the creditors all that he believes could ultimately be proved to be legally due them, and saving them the expense, which would be large, of futile litigation.

█ On the facts presented to us, as disclosed by the testimony as it comes to us from the Referee, and on which we must render a decision, we are satisfied that the position of the trustee is correct, if interest be added, for the following reasons: As we have already shown, there are three questions presented for decision, the first of which is as follows: If a bank, in the ordinary course of business, receives deposits from a depositor before and during four months next preceding such depositor's adjudication in bankruptcy, and if during such four month period, with notice that such depositor is in financial difficulties, the bank applies his deposits against his indebtedness to the bank, has the bank thereby received a voidable preference? The law is very clear that this question must be answered

in the negative. The Supreme Court so decided as early as 1904, in New York County Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380, and again in Studley v. Boylston Bank, 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313. See also United States v. Butterworth-Judson Corp., 267 U.S. 387, 45 S.Ct. 338, 69 L.Ed. 672, and Citizens National Bank of Gastonia, N. C. v. Lineberger, a decision of the Circuit Court of Appeals, Fourth Circuit, 45 F.2d 522.

This question involves an interpretation of the following portions of Sections 60 and 68 of the Bankruptcy Act defining preferred creditors, set-offs, and counterclaims, respectively:

"Sec. 60. Preferred creditors. (a) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition in bankruptcy, * * * the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class." 11 U.S.C.A. § 96, sub. a.

"Sec. 68. Set-offs and counterclaims. a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

"b. A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate and allowable under subdivision g of section 93 of this title; or (2) was purchased by or transferred to him after the filing of the petition or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy." 11 U.S.C.A. § 108, subs. a and b.

An ordinary bank deposit differs from other payments or transfer of money or property, as contemplated by section 60 of the Bankruptcy Act, in that it is withdrawable at the will of the depositor and does not operate actually to diminish the depositor's estate. In other words, the ordinary deposit results in substituting for currency, checks, drafts, etc., a corresponding credit with the bank which may be checked against or withdrawn, and which provides the depositor with a medium of exchange in universal use in the transaction of business. Thus, it is now the settled law that if a bank receives deposits in the ordinary course of business subject to withdrawal by check, such bank has not received a preferential transfer under Section 60 of the Bankruptcy Act even though such deposits were made while the depositor was insolvent, and within four months of bankruptcy, and even though the bank's officers knew that the depositor was in a bad financial condition, unless some fraud or collusion is shown. Such is the principle announced in the cases above cited. As pointed out by the Supreme Court in the Massey case, supra, there is nothing in the Bankruptcy Act which prevents an insolvent from conducting his business in the usual way, or prohibits banks from dealing with him on that basis.

It is true that, because of the fact that section 68 of the Act permits a set-off in the case of mutual debts and credits, the use of this privilege, which effects a legal preference by a creditor bank in connection with a deposit of an insolvent debtor, appears to open the way to an indirect accomplishment of results prohibited by section 60. However, in an effort to reconcile these two provisions of the Bankruptcy Act, and to prevent abuse, the law had, as above explained, become well settled prior to the amendments to the Bankruptcy Act in 1938 that deposits made in the ordinary course of business generally, upon an open account and subject to withdrawal by check, are not preferential transfers even if made while the debtor is insolvent, and even though the bank had knowledge of the depositor's insolvency. In such cases, banks have been permitted to exercise the privilege of set-off against these deposits either before or after bankruptcy. On the other hand, if the deposit be made as part of a scheme

or device to pay the bankrupt's indebtedness to the bank, while insolvent, through the medium of a set-off, the rule is otherwise. See Mechanics Bank v. Ernst, 231 U.S. 60, 34 S.Ct. 22, 58 L.Ed. 121; also, Twentieth Street Bank v. Gilmore, 4 Cir., 71 F.2d 594; Bank of Commerce & Trusts v. Hatcher, 4 Cir., 50 F.2d 719, 85 A.L.R. 359, decisions of the Circuit Court of Appeals, Fourth Circuit; and Collier on Bankruptcy, 14th Ed., Secs. 60.15 and 68.16.

In this connection, it may be pointed out that when the 1938 amendments to the Bankruptcy Act were under consideration by Congress, certain changes in section 68 were proposed which would have altered the long established rule as just stated. These changes, however, were not adopted. Therefore, despite the fact that the term "transfer" under section 60 now has a wider significance than formerly; and notwithstanding the fact that the language of this section has been extensively revised for the purpose of striking down preferences, whether effected directly or by remote or obscure devices, it is clear that there was no intention on the part of Congress to alter the accepted law as to bank deposits. See Collier on Bankruptcy, 14th Ed., Secs. 60.15, 68.01.

 Turning to the second question which we are called upon to answer, it is as follows: "Even if question No. (1) be answered in the negative, do, nevertheless, the indorsers on such depositor's notes to the bank receive a voidable preference by the application of the bankrupt's deposits as set forth in question No. (1)?"

This question must also be answered in the negative. It is true these indorsers are, under the Bankruptcy Act, to be treated as creditors. See In re Schleicher Printing Corp., 2 Cir., 62 F.2d 503; Collier on Bankruptcy, 14th Ed., Sec. 60.17. Nevertheless, it has been held by the Court of Appeals of this Circuit that indorsers, in the position of those now before us, are not to be treated as receiving a voidable preference, in the absence of evidence of fraud or bad faith. See Drugan v. Crabtree, 4 Cir., 299 F. 115.

On behalf of the objecting creditors, it is strenuously argued that the trustee should have sued the guarantors to recover the amount of the bankrupt's deposits in both banks, namely, $68,515.05, which were applied against the bankrupt's indebtedness to the banks. It is claimed that by not doing so, these guarantors got a preference through the banks' set-off of these deposits and that if suit were brought against them, it could be proven that the conduct of these guarantors in their capacity as officials or directors of the bankrupt company in making the deposits was fraudulent and collusive.

However, our examination of the testimony before the Referee satisfies us, as it did him, that these deposits were made in due course of business, without any attempt to build up balances, and no restrictions had been placed upon withdrawal of any part of these funds; and that there is nothing in the evidence to substantiate the claim of fraud or collusion between the banks and the guarantors on the notes or any one else representing the bankrupt corporation.

The testimony shows that neither bank ever requested any of these deposits, nor was there any artificial "build-up" of them. There were constant and material variations in the amount of the deposits due to normal business transactions. Some months the total of deposits was as low as $20,000 and at one or more times they reached a maximum of $175,000. From time to time very substantial amounts were withdrawn from these bank balances by checks payable to other creditors. It was not until October 16, 1944 when the banks were told of the Government's refusal to pay substantial claims of the bankrupt corporation, thereby placing it in an insolvent position, that the banks knew of such condition.

Thus we find no credible evidence, from the facts as presented to us, of any fraud or bad faith on the part of any of the indorsers. Furthermore, the bank statements show no deposits made near to the time of insolvency whose amount exceeded the deposits made previously under normal conditions of current business.

416

Finally, we come to the third and remaining question which is presented in this case: Did the Baltimore National Bank's application to the bankrupt's indebtedness of the sum of $22,551.86, which it received from the United States Government on December 6, 1944, constitute a voidable preference?

Our conclusion as respects the bank's right to this sum is different from that with respect to the withheld deposits. That is to say, we believe the trustee in bankruptcy is correct in the position which he has taken, on advice of counsel, that under no established theory of law did the bank have the right to retain the $22,551.86. It may be said that we are not called upon to decide this question because, by the terms of the compromise settlement, the bank has agreed to relinquish this sum in its entirety without, however, admitting any legal liability so to do but merely as part of the offer of compromise, in order to avoid possible lengthy and costly litigation. However, it seems appropriate for the Court to rule definitely on this question.

As succintly stated by counsel for the trustee in bankruptcy, unless the bank had a lien on this fund, seizure of it within one month of bankruptcy and its application towards the bankrupt's pre-existing indebtedness to the bank on October 16, 1944, constituted a voidable preference. The bank has claimed that it did have a lien as assignee because of (1) the terms of the individual notes evidencing the bankrupt's indebtedness; and (2) a so-called general banker's lien. However, we do not think that either of these grounds is legally correct.

From the facts existing at the time this fund was received by the bank, that the bank had no right to retain this money, except as in the nature of an agency or trust account for the bankrupt, seems beyond question. As explained previously herein, the contract with the Government had been terminated for the convenience of the latter in 1943, and all sums due the bank by the bankrupt and its co-contractor on account of the loan obtained from the bank for the purpose of completing the Government project, had been paid by September, 1944. The Cummins Company could and should have formally terminated its assignment agreement with the bank, but did not do so apparently for convenience and to avoid further formalities with the Government. The bank promptly paid to the bankrupt's co-contractor its one-half share of the December 6, 1944, remittance from the Government. We are satisfied that the bank should have made a similar, prompt remittance to the present bankrupt. The assignment to the bank recites that it "is given to secure loans or advances made or to be made by the Assignee in accordance with the terms of a Loan Agreement dated November 17, 1942, entered into by the Assignors with the Assignee and Guaranty Trust Company of New York, to aid and assist the Assignors in financing the Project Contract and fulfilling the same."

It is true, the notes which the bankrupt gave to the bank, from time to time, on account of this loan contain the usual broad recital that any funds of the bankrupt on deposit with, or held by, or in the possession of the bank for any purpose, might be applied, at the maturity of the notes, either towards their payment or the payment of any other then indebtedness of the bankrupt to the bank. While it is not clear from the testimony and pleadings just what may have been such other indebtedness of the bankrupt to the bank, at the time the final payment due under this special loan agreement was made, the terms of that agreement control over any recital that may appear contrary thereto in the notes themselves. Thus it is clear that since the loan agreement had been completely fulfilled by all parties to it prior to December 6, 1944, when the bank received from the Government the payment with which we are here concerned, the bank had no interest in it whatsoever except to hold it as agent for the bankrupt, subject to the latter's order. This fund was not a deposit at all, received from the bankrupt.

In so far as concerns the contention made on behalf of the bank that it had a so-called general banker's lien on this fund,

suffice it to point out, as was said in Lowden v. Iowa-Des Moines Nat. Bank & Trust Co., D.C., 10 F.Supp. 430, at 433 (affirmed 8 Cir., 84 F.2d 856, certiorari denied 299 U.S. 584, 57 S.Ct. 109, 81 L.Ed. 430), that if such [10 F.Supp. 433] "is a lien at all, it is what the words indicate, a 'possessory lien,' *which means only that the bank had a right to hold and retain possession of the deposit for the application of a proper set-off.*" (Emphasis supplied.) See also Collier on Bankruptcy, 14th Ed., Sec. 68.16.

We conclude, therefore, that the trustee in bankruptcy is entitled to receive not only the entire amount of $22,551.86 as contemplated by the compromise settlement, but also interest at the legal rate on this amount from December 6, 1944, to August 2, 1946, the date of the bank's joint offer to pay this amount in settlement. Since, as we find, the bank had no legal justification for retaining the fund in the first instance; and since it is the duty of the bankruptcy court to conserve scrupulously for a bankrupt's creditors every dollar to which they are legally entitled, we believe that, on equitable principles, the bank should be required to pay interest as stated.

Except as respects the omission of interest, we conclude, for the reasons herein given, that the trustee in bankruptcy was fully justified in accepting the compromise offer of settlement from the banks and the indorsers of the notes held by the banks. Therefore, with this single exception, the action of the Referee in ratifying such acceptance was proper, and, if the offer is reformed to provide for interest, the Referee's action will be affirmed.

The situation with which the trustee in bankruptcy was faced is very clearly and accurately stated by his counsel in their brief, as follows, and we are satisfied that their judgment was sound in advising the trustee in bankruptcy to accept the proposal with the sole qualification with respect to the interest item just discussed: "Prior to determining to accept the offer, the Trustee decided that he could probably win a contest against the Baltimore Na-

tional Bank for restoration of the $22,551.87; and that, in the absence of facts unknown to him, he would fail on claims against either the banks or the guarantors on account of the October 16, 1944, transactions. During the investigation, the Trustee requested Mr. Grandberg, who was, together with Mr. Patz, representing dissenting creditors, to submit to the Trustee any additional facts known to them, and upon failure of them so to do, the Trustee has no reason to believe that any facts exist which would change the conclusions reached by him on his independent investigation. Having made the conclusions stated, the Trustee recommended the compromise settlement which will, in effect, require repayment of 100% of what the Trustee believes he is entitled to recover."

An order will be signed in accordance with this opinion.