**Vernon E. MARTENS, M.D., Plaintiff,**

v.

**HADLEY MEMORIAL HOSPITAL, Defendant,**

v.

**BLUE CROSS AND BLUE SHIELD OF the NATIONAL CAPITAL AREA, and First American Bank, N.A., Garnishees.**

**Civ. A. No. 87–1317.**

United States District Court, District of Columbia.

Feb. 2, 1990.

Lee H. Karlin, Washington, D.C., Christian Camenisch, Alexandria, Va., for plaintiff.

Ronald L. Early, Louis S. Bonanni, Lerch, Early, Roseman & Frankel, Bethesda, Md., for defendant Hadley Memorial Hosp.

MEMORANDUM OPINION

(Awarding Payment of Judgment)

BARRINGTON D. PARKER, Senior District Judge:

BACKGROUND

On February 17, 1989, this Court, in accordance with a jury award of damages,

entered judgment in favor of the plaintiff Vernon E. Martens, M.D. and against defendant Hadley Memorial Hospital ("Hadley" or "Hospital") in the amount of $609,906. Hadley owed this amount to Dr. Martens for professional pathological services rendered from January 1983 through June 1986.

Several months after the jury award, plaintiff's counsel attempted to satisfy the judgment by securing from this Court two Writs of Attachment.[1] The first, served on Blue Cross and Blue Shield of the National Capital Area ("BC/BS"), revealed an indebtedness to Hadley for a BC/BS claims payment in the amount of $76,565. Thereafter, plaintiff's counsel moved to condemn that claims payment.

The second attachment, served on First American Bank ("First American" or "Bank"), revealed that Hadley had on deposit $203,076 in demand accounts and $1,306,042 in a Debt Service Reserve Fund established in accordance with a Hospital Revenue Bond Issue and Loan Agreement ("Loan Agreement").[2] Martens moved to condemn these two accounts. The Bank then filed a motion to release attachment of the accounts, arguing that it had a prior perfected security intertest in the attached funds.

Plaintiff's counsel's response memorandum of November 21, 1989, in opposition to the Bank's motion to release attachment, did not contest the Bank's superior interest as a secured creditor. Rather, he argued that a material default by Hadley on the Loan Agreement is a precondition to First American's right to dissolve the writ or take possession of the assets. For authoritative support, he relied primarily upon section 28:9–311, D.C.Code Ann. (1981) ("Alienability of a debtor's rights [in collateral]: judicial process") and upon cases decided under the corresponding Uniform Commercial Code ("U.C.C.") Section 9.311.[3]

On January 5, 1990, the Bank as intervenor filed a response to Martens' opposition to release attachment of the BC/BS claims, arguing that its security interest extended to Hadley's interest in the BC/BS claims payment. It further alleged that Hadley was in default under the Loan Agreement and that as a secured party, the Bank was entitled to exercise its remedies under the U.C.C. to defeat plaintiff's judgment lien.

First American specifically argued that: default by Hadley was not legally required for this Court to direct the transfer of the attached assets to the Bank as Trustee; even if default was found to be a prerequisite to the exercise of the Bank's remedies as a secured creditor, Hadley's failure to stay execution of the judgment against it violated the conditions of the Loan Agreement and permitted the Bank to declare Hadley in default; having declared Hadley in default, the Bank was now free to accelerate any indebtedness owed to it by Hadley, including a separate unsecured $2.5 million loan ("First American Loan").[4] Finally, First American contended that it is entitled to exercise a common law right of set off against debts owed to it by Hadley as to any accounts and investments held by the Bank. The Bank has not accelerated any debt of the Hospital or declared any debt presently due and payable.

---

1. D.C.Code Ann. §§ 16–541 to 16–556 (1981).

2. On May 1, 1987, the District of Columbia and Hadley Memorial Hospital entered into a Loan Agreement and Indenture of Trust (naming First American as Trustee), pursuant to which District of Columbia Hospital Revenue Bonds (Hadley Memorial Hospital Issue) in the amount of $16.5 million were authorized.

   The Loan Agreement governs the conditions for the issuance of the Hospital Revenue Bonds. The Loan Agreement established a debt reserve fund to service the bond loan. Hadley's interest in the reserve fund is subject to the repayment of the bond loan.

3. U.C.C. § 9–311 has been enacted in D.C.Code Ann. § 28:9–311 (1981).

4. Hadley's failure to stay execution of the judgment pending appeal constitutes an event of default under sections 8(d) and (g) of the $2.5 million First American Loan. Under section 6.2(1)(iv) of the Loan Agreement, entitled "Restrictions on Indebtedness," Hadley is prohibited from incurring any indebtedness except the $2.5 million debt incurred pursuant to the First American Loan.

## ANALYSIS

Two issues are presented by the motions now before the Court: whether under the U.C.C. and the applicable D.C.Code, First American's priority interest in the BC/BS revenue and in the Hospital accounts held by the Bank enables the Bank to defeat Martens' writ of attachment; whether First American may use its common law right of set off to quash the attachment of the Hospital's bank accounts. These issues will be addressed in turn.

### A.

■ First American claims, and the plaintiff Martens does not contest, that under the Loan Agreement, First American as Trustee has an enforceable security interest in the "unrestricted revenues"[5] of Hadley Memorial Hospital.[6] Nor does he dispute that the BC/BS revenues owed to Hadley are accounts[7] under the Loan Agreement and therefore subject to First American's prior perfected security interest.[8] Rather, he argues that in the absence of a material default on the loan underlying the debt, First American's security interest in the BC/BS account is neither presently enforceable nor does it suffice to dissolve the writ of attachment. The Bank alleges that it has declared Hadley in default under the terms of both the Loan Agreement[9] and the Indenture.[10]

Art. IX of the U.C.C. and the corresponding D.C.Code sections allow a creditor to obtain a security interest in property of the debtor to insure payment of the debt owed. *See* D.C.Code Ann. §§ 28:9–101 to 507 (1981). If the debtor defaults on the debt, the creditor can avail himself of the remedies provided in Art. IX. *See* D.C.Code Ann. §§ 28:9–501 to 507 (1981). Among the remedies available to a secured party is the right to seize the collateral. *Id.* § 28:9–503. Default is, however, the essential prerequisite to the exercise of the secured parties rights.[11] In the absence of such, a secured creditor cannot seize the collateral and apply it against the loan or otherwise prevent another creditor of the debtor from taking possession of the collat-

---

**5.** Section 1.1 of the Loan Agreement defines unrestricted revenues as: "all *accounts and general intangibles* now owned or hereafter acquired by the Hospital, and all *proceeds* therefrom whether cash or noncash, all as defined in Article 9 of the UCC: excluding, however, gifts, grants, bequests, donations and contributions heretofore or hereafter made, and the income and gains derived therefrom, which are specifically restricted by the donor or grantor to a particular purpose." (Emphasis added.)

**6.** Loan Agreement § 2.3(3)(i).

**7.** The D.C.Code, which follows the U.C.C., defines accounts as "any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper." D.C.Code § 28:9–106 (Supp. 1989).

**8.** *See Malakoff v. Washington,* 434 A.2d 432, 434 (D.C.App.1981) ("[g]enerally, priority of liens or security interests is determined according to the well known principle of 'first in time first in right'") (citing cases); *Shaw Mudge & Co. v. Sher–Mart Mfg. Co., Inc.,* 334 A.2d 357, 359, 132 N.J.Super. 517 (1975) ("[I]t has uniformly been held elsewhere ... that a secured creditor who has duly filed a financing statement is entitled to priority over a subsequent lien creditor seeking to levy on or otherwise claim the same collateral.") (citing cases).

**9.** Section 17.1(6) of the Loan Agreement enables First American to declare Hadley in default upon "an event or conditions [which permit] the acceleration of the scheduled maturity of any *other Indebtedness* of the Hospital in the outstanding aggregate amount of at least $100,000." (Emphasis added.)

The $2.5 million First American Loan constitutes other Indebtedness and under its terms (sections 8(d) and (g)), the final judgment entered against Hadley, and Hadley's failure to stay execution of that judgment pending appeal, constitutes an event of default.

**10.** Section 8.1(1)(iv) of the Indenture provides that an event of default under the Loan Agreement constitutes a default under the Indenture. Therefore, an unsatisfied final judgment entered against Hadley constitutes a default under both the Loan agreement and the Indenture.

**11.** D.C.Code Ann. § 28:9–501(1) (1981) provides in relevant part: "[w]hen a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part and ... those provided in the security agreement. He may reduce the claim to a judgment, foreclose or otherwise enforce the security interest by any available judicial procedure."

eral.[12] *See, e.g., Frierson v. United Farm Agency, Inc.,* 868 F.2d 302, 304–305 (8th Cir.1989), *aff'g in relevant part* 672 F.Supp. 1272 (W.D.Mo.1987); *Sur–Gro Plant Food Co., Inc. v. State Savings Bank,* 730 S.W.2d 602, 604–605 (Mo.Ct. App.1987); *Humble Oil and Refining Co. v. Pathological and Diagnostic Laboratories, Inc.,* 11 U.C.C. Rep.Serv. 386, 387 (N.Y.Civ.Ct.1972); *see also* D.C.Code Ann. § 28:9–501(1) (1981) (*"When a debtor is in default,* a secured party has the rights and remedies provided in this part and ... those provided in the security agreement.") (emphasis added); D.C.Code Ann. § 28:9–503 (1981) ("Unless otherwise agreed a secured party has *on default* the right to take possession of the collateral.") (emphasis added). The question presented here is whether under Art. IX of the U.C.C., given the circumstances of Hadley's default, First American can assert its rights as a secured party to quash plaintiff's writs of attachment in the BC/BS revenue and in the Hadley accounts held by First American.

Plaintiff cites U.C.C. § 9–311, adopted and codified in the District of Columbia at D.C.Code Ann. § 28:9–311 (1981) in support of the argument that First American cannot dissolve the above writs. Section 28:9–311 provides:

> The debtor's rights in collateral may be voluntarily or involuntarily transferred (by way of sale, creation of a security interest, attachment, levy, garnishment or other judicial process) notwithstanding a provision in the security agreement prohibiting any transfer or making the transfer constitute a default.

The purpose of this section, according to the U.C.C., is "[t]o make clear that in all security transactions under this Article, the debtor has an interest (whether legal title or an equity) which he can dispose of and which his creditors can reach." U.C.C. § 9–311 comment 1; *Frierson,* 868 F.2d at 305 (permitting secured creditor to impair "the status of other creditors by preventing them from exercising valid liens ... would fly in the face of all Article 9, which is premised on the debtor's ability to exercise rights in the property" (citing Mo.Stat. Ann. § 400.9–311)); *New Jersey Bank v. Community Association Farms, Inc.,* 666 F.2d 813, 819 (3d Cir.1981); *Brescher v. Associates Financial Services Company,* 460 So.2d 464, 466 (Fla.App.1984) (citing comment 1 as establishing the intent of the U.C.C. § 9–311 to change the common law rule in some states that prohibited the judgment creditor from proceeding against debtor's interest in personal property covered by a security agreement).[13]

Courts that have examined the issue of default under Art. IX of the U.C.C. have held that the mere declaration of a default in the absence of other affirmative remedial action, such as the acceleration of the loan, does not entitle the secured party to

---

**12.** First American argues that common sense is better served by finding that "a security agreement is absolute and is not conditioned on a default by [the debtor]." *Empson & Co. v. Marsalle Imports, Ltd.,* No. 86–1944, 1987 WL 12793 (D.D.C. June 12, 1987) Allfeds 1987 WL 12793, (citing *Shaw Mudge & Co. v. Sher–Mart Mfg. Co., Inc.,* 334 A.2d 357, 132 N.J.Super. 517 (1975)).

Shaw Mudge, however, can be distinguished on its facts from the present case. In that case, prior to the date of the scheduled hearing on the matter, the debtor failed to make a payment on the loan, and the secured party's assignee declared the debtor in default and demanded payment in full. 334 A.2d at 358. In this case, First American has declared Hadley in "default" but has not acted to accelerate the loan. As the district court held in *Frierson v. United Farm Agency, Inc.,* 672 F.Supp. 1272, 1276 (W.D.Mo. 1987), "[i]f a secured creditor with a security

interest over all the debtor's property is permitted to rely on a default, whether technical or not, to prevent another creditor from executing on the debtor's property, while treating the loan as not in default when dealing with the debtor and others, severe inequities would result."

**13.** Indeed, D.C.Code Ann. § 28:9–311 (1981) is consistent with other U.C.C. provisions which offer the secured creditor protection in the continuation of any security interest in collateral following voluntary or involuntary transfer. D.C.Code Ann. § 28:9–306(2) (1981) provides:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

take possession of the collateral under U.C.C. § 9–503. *Frierson*, 868 F.2d at 304–305; *see also Humble Oil & Refining Co. v. Pathological and Diagnostic Laboratories, Inc.*, 11 U.C.C.Rep.Serv. 386 (N.Y. Civ.1972) (ordering the transfer of collateral to judgment creditor notwithstanding the prior perfected security interest of a secured creditor in the collateral and default by debtor, because the secured creditor chose to allow the debtor to retain possession of the collateral prior to enforcement by judgment creditor).

In *Frierson v. United Farm Agency, Inc.*, 672 F.Supp. 1272 (W.D.Mo.1987), 868 F.2d at 303–305, the trial court, on facts similar to those in the present case, found that a secured party cannot assert its rights under a security agreement to dissolve a writ of attachment or prevent a judicial sale "absent a declaration that the secured debt is in default *and an exercise by the secured creditor of its rights* over the collateral." *Id.* at 1276 (emphasis added). The trial court further stated:

> Most secured loans provide for numerous events which constitute default, many of which are technical in nature and are inserted in the loan documents to enable the lender to declare the note in default when even a relatively minor problem arises with the loan or the debtor. Thus, at any given time many secured loans are technically in default, but are never treated as such by secured creditors. In addition, a secured party will occasionally, as Merchants has done in this case, ignore a default which is more than just a technical default. If a secured creditor with a security interest over all the debtor's property is permitted to rely on a default, whether technical or not, to prevent another creditor from executing on the debtor's property, while treating the loan as not in default when dealing with the debtor and others, severe inequities would result.... Such an approach would be against both the spirit and the letter of the Uniform Commercial Code.

Id.

On appeal, the Eighth Circuit agreed:

> Merchants [the secured party] cannot refuse to exercise its rights under the security agreement, thereby maintaining UFA [debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens. Allowing Merchants to do so would fly in the face of all Article 9, which is premised on the debtor's ability to exercise rights in the property. *See* § 400.9–311. Regardless of whether the funds in question are viewed as collateral or as proceeds, Article 9 requires that Frierson [judgment creditor] take the remaining funds subject to Merchants' security interest if the bank refuses to exercise its remedies under the code. § 400.9–306(2). Merchants' security interest in the funds will continue, and Merchants can trace and recapture when it chooses to *declare the loan in default and accelerate the debt.* (Emphasis added.)

868 F.2d at 305.

In sum, under D.C.Code Ann. § 28:9–311 (1981) and the cases cited above, the exercise of First American's security interest in the BC/BS accounts under D.C.Code Ann. § 28:9–501 to 507 (1981) requires not only the declaration of a default, but also the good faith execution of the affirmative remedies, such as acceleration, provided in the loan document. In the absence of First American's exercise of its right to accelerate the debts underlying either the Loan Agreement or the First American Loan, the Bank's remedies under the U.C.C. do not presently serve to defeat the writ of attachment obtained against the BC/BS account.

The above analysis applies with equal force to the accounts held by First American. First American's status as a secured creditor does not suffice to dissolve the writ of attachment against the Hadley accounts held by First American. In the absence of the acceleration of either the Loan Agreement or the First American Loan, the Bank cannot prevent the condemnation of those accounts and transfer of the revenues to Martens.

## B.

█ First American argues, alternatively, that the Hadley bank accounts are subject to First American's common law right of setoff. This claim has merit, but only as to the demand deposit accounts containing $203,076. The Debt Service Reserve Fund, established to service the bond debt, is subject to a separate legal analysis and leads to a different result.

While no District of Columbia statutory provision specifically grants banks a right of setoff, this Court has recognized the existence of such a right:

> It is well established that a bank generally has the right to set off its debts to a customer, such as account balances, against debts owed to it by that customer because of other transactions. 5A *Michie on Banks and Banking*, ch. 9, § 114 (1983). Moreover, this right does not have to be exercised before a writ of attachment is served by another creditor. The bank may exercise its right of setoff once a depositor's account *is threatened by attachment.*

*Baltimore and Assoc., Inc. v. Municipal Escrow and Title Co.*, 625 F.Supp. 1271, 1272 (D.D.C.1985) (emphasis added); *accord Tri–State Envelope of Maryland v. Americans With Hart*, 688 F.Supp. 769, 772 (D.D.C.1988); *cf. Boyle v. American Security Bank*, 531 A.2d 1258 (D.C.App. 1987) (the bank properly asserted its right to set off funds in a customer's account when a promissory note between the customer and the bank provided for setoff upon default). Other courts have specified that in order "for [the] right of setoff to apply, there must be mutuality of obligation between debtor and creditor, a true debtor-creditor relationship." *In re Brittenum & Associates, Inc.*, 868 F.2d 272, 275 (8th Cir.1989) *quoting In re Multiponics, Inc.*, 622 F.2d 725, 727 (5th Cir.1980).

Such is clearly the present situation. Hadley and First American have established a debtor-creditor relationship pursuant to the conditions of the First American Loan. Here, Hadley's accounts are not merely threatened by attachment; they have been attached. Thus a straightforward reading of the above authorities would indicate that First American has a valid and present right to exercise its common law right of setoff as to the demand deposit accounts.

Plaintiff argues that, here too, in the absence of a material default the Bank's right of setoff has not yet ripened. Plaintiff cites courts in other jurisdictions, which have held, "[A] bank cannot ... defeat a garnishment on the ground that a depositor owes the bank money on a note not yet due." *Frierson*, 868 F.2d at 304 (quoting *Prince v. West End Installation Service*, 575 S.W.2d 831, 832 (Mo.App.1978)).

The *Frierson* trial court, confronted with a situation analogous to the one before this Court, held that in the absence of a declared default and acceleration of the underlying debt the loan could not be said to be due and the secured creditor could not rely on setoff to quash the garnishment. *Frierson*, 672 F.Supp. 1272 (W.D.Mo.1987), 868 F.2d 302–304.

The Eighth Circuit, however, reversed the trial court, holding instead that a debt is due and owing for the purposes of quashing a garnishment when "the bank has the *power* to deem the debt due, not when the bank actually *exercises* that power." *Frierson*, 868 F.2d at 304, (citing *Herd v. Ingle*, 713 S.W.2d 887, 890 (Mo. App.1986) (emphasis in original)). The Eighth Circuit went on to say that "[u]nder Missouri law, a bank need not take steps to effect a setoff prior to garnishment, but only must show that a default existed." *Id.* at 304.

Thus, while under the U.C.C. and the corresponding sections of the D.C.Code Martens prevails over First American in the matter of the present motions to release attachment, under First American's common law right of setoff, the writ of attachment on the Hadley demand deposit accounts totaling $203,076, must be quashed.

## C.

█ First American similarly relies upon the claim of a right of setoff in the funds on deposit in the Debt Service Reserve

Fund. This Court finds that such a claim fails to defeat the writ of attachment under the well settled principle that "deposits for special purposes are held as trust funds and not as bank assets, hence the bank is without the right to appropriate the deposit to its own use as a setoff." *Avant v. United States*, 165 F.Supp. 802, 805 (E.D. Va.1958) (citing *United States v. Butterworth–Judson Corp.*, 267 U.S. 387, 45 S.Ct. 338, 69 L.Ed. 672 (1925)); *see also Energetics, Inc. v. Allied Bank of Texas*, 784 F.2d 1300 (5th Cir.1986); *Matter of Texas Mortg. Corp. v. Guadalupe S. and L. Assoc.*, 761 F.2d 1068 (5th Cir.1985); *Union Bank of Helena v. Loble*, 20 F.2d 124 (9th Cir.1927).

The above exception to a bank's right of setoff clearly applies. Here, however, there exists a clear contractual trust relationship between First American and the District of Columbia as established in the bond issue related Loan Agreement and Indenture of Trust. The funds on deposit in the Debt Service Reserve Fund are designated not for use by Hadley, the depositor, but rather for the benefit of the District of Columbia. First American as trustee cannot setoff the funds plaintiff holds in trust and accordingly its claim to a right of setoff fails to quash the plaintiff's writ of attachment in the Debt Service Reserve Fund.

Accordingly, First American's motions to release attachment are granted as to the demand deposit accounts of $203,076. They are denied as to the BC/BS claims payment of $76,565 and Debt Service Reserve Fund totaling $1,306,042.

An appropriate Order follows.