John A. HADDEN, Trustee for Manufacturers Trading Corporation,

v.

The UNITED STATES.

UNION INDUSTRIES, Inc., and John A. Hadden, Trustee for Manufacturers Trading Corporation,

v.

The UNITED STATES.

Nos. 50115, 49884, 48867, 413–52, 49831.

United States Court of Claims.

April 5, 1955.

612

Leward C. Wykoff, Washington, D. C., for plaintiffs. Arter, Hadden, Wykoff & Van Duzer, Peter Reed, Richard C. Weiss and Samuel K. Walzer, Cleveland, Ohio, were on the briefs.

William A. Stern, II, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

Seven separate cases have been consolidated in this proceeding. Two have been dismissed by stipulation. Four of the remaining cases involve several claims by John A. Hadden as trustee for Manufacturers Trading Corporation and the Government's counterclaims thereto. We shall take them up separately, discussing the fifth case at the end of the opinion. The facts are naturally complicated and the procedure difficult.

First, some of the claims have already been decided or are conceded. In Case No. 49884 (Contract NOrd–7426, Item No. 2) defendant has conceded that the plaintiff is entitled to recover $63,000. Hadden v. United States, 105 F.Supp. 1010, 123 Ct.Cl. 246. Furthermore, in Case No. 413–52 the defendant concedes its indebtedness to plaintiff for overassessment of taxes in the amount of $231,276.61 with interest as provided by law. In Case No. 48867 (Contract UNR–TPs–2786) the Government also concedes an unpaid obligation of $248,375.

There remains the claim in Case No. 50115 where, under Contract NOrd–7426, Item No. 1, there is due Manufacturers Trading Corporation $113,417 if its contention is correct, or $8,879.83 if defendant's contention prevails. Contract NOrd–7426 originally was made between the Bureau of Ordnance of the Navy Department and Canonsburg Steel & Iron Works Division of Union Mining Company, subsequently known as Union Industries, Inc. (hereinafter sometimes referred to as Union). Union's contract called for the manufacture of 400,000 five-inch rocket bodies at a total price of $5,020,000. Under a financing agreement with the now bankrupt Manufacturers Trading Corporation (herein sometimes described as MTC), Union assigned all moneys due or to become due under this contract to MTC. The defendant does not dispute that the assignment was made in accordance with the applicable law and is valid.

The contract was subsequently terminated by the Government and the issue is whether it was terminated for default under section 23 of the contract or for the convenience of the Government under section 24. The parties agree that if the latter is the case more compensation is due the plaintiff than under the former hypothesis.

The parties entered the contract about November 1, 1944, and by March of the following year the Navy advised the contractor of its failure to perform satisfactorily. The Navy issued a further reminder to this effect and revised the production schedule on June 8. The Navy then decided to cancel the contract for default. In a conference on June 27 with the contracting company which had recently come under new management, the Navy and the company agreed, in order to save face for the new management, to cancel the contract for the convenience of the Government upon the express understanding that the contractor would only be permitted to submit in its termination claim (1) tooling costs and (2) its inventory of existing special material.

In a letter of July 2, 1945, one of the managers of the Canonsburg Division of Union, referring to the conference of the 27th of June, made the formal proposal that all work on the contract cease (except for work in progress), that termination be on the basis of paying the contractor for all tooling costs and special materials and that an advance be made to the contractor on this basis. The Navy acknowledged this communication and replied that termination for the convenience of the Government would be instituted upon receipt of approval by Union's directors of the proposed procedure. Shortly thereafter the Navy was advised by a representative of the Canonsburg Division that Union's board of directors had approved the agreement of the 27th.

There followed a series of communications and instructions which indicate that the Government was proceeding as though the termination had been for the convenience of the Government. Finally, on February 14, 1947, the Navy withdrew its previous notice of termination for the convenience of the Government,

saying the conditions agreed upon at the June 27 conference had beeen inadvertently omitted therefrom, and issued a notice of termination for default. The dispute as to what type of termination had been made came before the Armed Services Board of Contract Appeals which held in favor of the Government; it found that the agreement had been made at the conference to restrict compensation to the formula applicable to terminations for default, that the letter of July 2 was reasonably understood by the Navy as confirming that agreement, and that the Navy's reply was made with that understanding. There being no allegation that these findings were arbitrary, capricious, or not supported by substantial evidence, they are binding on us to the extent that they involve disputed facts.

■ The contentions made, however, primarily turn on questions of law. The plaintiff relies on the terms of section 23 of the contract which reads in part:

"Termination of work hereunder shall be affected by delivery to the Contractor of a Default Notice of Termination specifying that termination is for default or failure, the extent to which performance under this contract shall be terminated, and the date upon which such termination shall become effective."

There is no doubt that Union never received such a notice until 1947. On the other hand, the fact that no such notice was delivered can hardly be raised by the party at whose request the Government refrained from issuing such a notice.

Sections 23 and 24 provide varying bases for compensating contractors whose contracts had been terminated. The agreement of June 27 restricted the contractor's compensation to what is allowed for termination for default under section 23. In the later stages of the correspondence Government instructions and termination proposals made by the plaintiff were made on the much more generous grounds allowed under section 24. They included compensation for work in progress, administrative expenses, profits, etc. This was in accord with the part officials of the Government had agreed to play. Nevertheless, the defendant never paid more than it was required to pay under section 23; in fact, if the defendant's contention is sustained, the Government still owes the contractor over $8,000. Thus the Government did not act inconsistently with the agreement of June 27 that the termination would ostensibly be for the convenience of the Government even though the compensation would be limited to the terms of section 23.

■ The plaintiff also argues that the communications between Union and defendant subsequent to Union's letter of July 2 amounted to an offer for termination for the convenience of the Government on the part of the Government and its acceptance by Union, thus constituting a contract. The plaintiff then relies on the parol evidence rule to exclude any evidence of the prior oral agreement of the 27th of June. The plaintiff's position is not tenable. In the first place, termination by the Government in this case is not properly subject to contract. Termination here is a unilateral act by the Government which it may undertake at any time for its own convenience, or, if the contractor defaults, for his default. The Government is only required to properly signify its intention, to properly signal the jural act which it wishes to take. This it did on the 27th of June. None of the Navy's subsequent written communications was inconsistent with that first jural act, nor did the Government attempt to withdraw its original act, as was the case in Line Construction Co. v. United States, 109 Ct.Cl. 154. The parol evidence rule would apply if the act had been executed by signing a specific and complete document, but it was executed here by an oral communication.

■ For these reasons we hold that the contract was terminated for default or pursuant to an understanding that compensation would be limited to the liabilities that would be incurred in a termination by default. There is no allegation that this termination was not

deserved, nor that the facts are not as the Board of Contract Appeals has found them. The defendant, therefore, owes the plaintiff only $8,879.83 on this contract.

Originally the defendant's counterclaims against MTC were largely restricted to derivative liabilities based on Government claims against Union. These claims against Union totaled $2,517,872.69, consisting of $1,085.15 balance under renegotiation of a Government contract, $140,553 for excess profits, $507,706.91 for materials and supplies furnished by the Government under a Government contract, and $1,868,527.63 for income and excess profits taxes remaining unpaid. The plaintiff does not dispute the fact that Union is liable in these amounts, but insists that they cannot properly be set off against the claims of MTC.[1]

 In the beginning the defendant claimed that MTC was Union's successor in interest and thereby became liable for all of Union's debts. Defendant has now abandoned this position. The defendant presses its counterclaims based on the fact that MTC claims by virtue of assignments from Union. All the contracts except the one involved in Case No. 48867 contain clauses which prohibit the Government from asserting claims against the assignees of the contracts where such claims are based on independent transactions with the assignor. The defendant's counterclaims originated in transactions with Union, independent of the contracts upon which MTC here seeks to recover. To the extent that the counterclaims are based on the theory of assignment they must fall, with the exception of the aforementioned contract in Case No. 48867.

That contract involved the United Nations Relief and Rehabilitation Administration (UNRRA) program. It did not contain a clause saving any assignee thereunder from setoff by the Government. The plaintiff concedes that it must allow a counterclaim on this contract unless we determine that the Government acted as agent for UNRRA in executing the contract, or unless the plaintiff has an equitable lien on funds appropriated for UNRRA purposes.

From the facts and documents related in our findings, it appears that UNRRA was an international organization formed during World War II for relief and rehabilitation of recently liberated areas. It pooled the resources of the United Nations and other powers to be used for relief purposes and planned and coordinated their distribution. Member governments were to contribute to the support of UNRRA and the accomplishment of its purposes as their appropriate constitutional bodies should authorize. Finding 49 lists the apropriations Congress made for UNRRA purposes during the years 1944, 1945, and 1946. By the terms of the agreement between the member governments which created UNRRA, UNRRA had power to acquire, hold and convey property, to enter into contracts and undertake obligations, and in general to perform any legal act appropriate to its objects and purposes. Nevertheless, at its first session in 1943 UNRRA adopted the policy of obtaining its supplies wherever possible through the established procurement agencies of member governments.

Pursuant to this policy UNRRA relied upon the procurement services of the United States Government to obtain machinery for making glass jars. This was the subject matter of the contract in Case No. 48867, Contract UNR–TPs–2786, concluded between Amsler-Morton Division of Union Industries and the Procurement Division of the United States Treasury Department. The facts in connection with this contract develop as follows:

1. The defendant also asserted counterclaims against MTC directly. Of these counterclaims the first counterclaim in Case No. 49884 and the fourth in Case No. 48867 are for unpaid taxes of MTC. Defendant appears to have abandoned these in view of the subsequent certificate of overassessment issued to MTC in 1951. At a later point in the opinion we will discuss the other counterclaims which the defendant asserts against MTC directly.

UNRRA wrote Amsler-Morton that "for budgetary and planning purposes" it desired to receive quotations, terms, etc., on machinery for making wide-mouth glass jars. Amsler-Morton Division replied giving its figures. UNRRA then addressed a requisition to the United States Government specifying the nature of the machinery required. This requisition (also called a "request to supply") contained the suggestion that "equipment on this requisition be purchased from Frazier-Simplex, Inc., Washington, Pennsylvania." Under "Source of Funds" the requisition stated "It is understood that UNRRA undertakes to accept the above supplies subject to compliance with specifications and that upon delivery to UNRRA the total cost of such supplies is to be considered part of the contribution of the United States Government to UNRRA." By its Commitment Letter No. 467 the State Department designated the Treasury Department as authority to procure these supplies. The letter does not clearly show what funds were to be used in procuring the supplies, but it may be assumed that funds appropriated by Congress for the benefit of UNRRA were intended. The letter also authorized the Treasury to transfer these materials to UNRRA and authorized UNRRA to export them.

The Treasury, in its turn, requested and received quotations from Amsler-Morton Division for the machinery. After some further correspondence, the Treasury and Amsler-Morton Division of Union Industries entered into Contract UNR–TPs–2786, dated August 8, 1946. The contract was fully performed by Amsler-Morton Division and the machinery accepted by the authorities of UNRRA. The defendant, however, has not yet paid for these supplies, and now refused to pay MTC on the grounds that it is entitled to set off sums which MTC's assignor, Union, owes the Government.

Plaintiff denies the Government's right to setoff, alleging that the Government acted in the role of agent for UNRRA. The plaintiff argues that, for this reason, the debts by the United States to the plaintiff and the demand by the Government against the plaintiff are not of the same character, hence not mutual, and therefore not properly set off the one against the other. The plaintiff also contends that the moneys appropriated for UNRRA were a special fund upon which the suppliers of UNRRA material have an equitable lien. Plaintiff makes much of the fact that MTC took the assignment being well aware of the absence of a clause in this contract prohibiting setoffs, of the fact that the supplies were to be produced for UNRRA and to be paid for from appropriations made for UNRRA. Plaintiff concludes that MTC relied on these latter facts as a substitute for a no-setoff clause, and that MTC's reliance was justified.

We do not think that the United States acted as agent for UNRRA in procuring the machinery here in question. The United States acted in concert with and at the request of UNRRA; but there is nothing to indicate that UNRRA had any right to control the actions of the defendant when it was procuring supplies for UNRRA or that it was bound by the actions of the defendant. Nor does it appear how UNRRA is liable under the present circumstances as principal contracting party. UNRRA's requisition ("request to supply") suggested the equipment be purchased from Frazier-Simplex, Inc., Washington, Pennsylvania. The United States bought elsewhere. It was merely a suggestion in a "request." This hardly sounds like the dealings one usually finds between principal and agent.

The UNRRA request indicated that *upon delivery to UNRRA* the cost of such supplies was to be considered a part of the contribution of the United States. Had the supplies been undelivered or destroyed prior to delivery, the defendant assumed this risk in relation to UNRRA. The defendant assumed the burden of contributing its services when it agreed to the UNRRA policy of using the procurement agencies of member governments. The commitment of the United

States was to contribute a certain amount of money either directly or in supplies. When it made the contribution in supplies, there was no contribution, no discharge from defendant's commitment to UNRRA, until UNRRA received the supplies. When the United States contracted for the machinery it did so on its own account, for the purpose of obtaining machinery to be contributed by it to UNRRA, and not as mere agent for UNRRA.

■■ Nor can we find that there is a fund on which the plaintiff can claim an equitable lien. In the first place, such liens are ordinarily created by agreement. Ketchum v. St. Louis County, 101 U.S. 306, 25 L.Ed. 999; Walker v. Brown, 165 U.S. 654, 17 S.Ct. 453, 41 L.Ed. 865; United States v. Butterworth-Judson Corp., 267 U.S. 387, 45 S.Ct. 338, 69 L. Ed. 672. There is nothing whatever in the contract between the Treasury Department and Union to suggest that the Government agreed to such a lien. It is true that the contracting parties must have been aware of the fact that the supplies were destined for UNRRA and were to be paid for out of UNRRA appropriations. But even such an implied reference to the appropriated funds could hardly suffice to create a lien unless the terms of the appropriations made this intention amply clear.

The contrary is true. In essence, the relevant appropriation acts, 58 Stat. 629, 59 Stat. 609, 59 Stat. 632, 634, 60 Stat. 221, 228, 60 Stat. 600, 603, use the formula "to enable the President to carry out the provisions of the Act of March 28, 1944 (Public Law 267)" 58 Stat. 122, as amended, 59 Stat. 612, 50 U.S.C.Appendix, § 1571 et seq. (1946 Ed.) This latter act embodies the agreement establishing UNRRA and authorizes appropriations to the President for United States participation in the UNRRA program. The agreement under Article V contemplated contributions in both supplies and resources. The policy of procurement through member governments had been established prior to the Congress' authorizing legislation. The Pres-

ident could, therefore, disburse funds directly to UNRRA or he could disburse supplies. Perhaps UNRRA might request which course he should pursue. But there is nothing to indicate a lien in favor of Government contractors who furnish supplies, when the President makes the contribution in that manner.

But even if we should regard the appropriations as nothing more than a drawing account that Congress set up for UNRRA, we cannot find anything to show that UNRRA created a lien on this account in favor of contractors supplying material to the United States for use by UNRRA. As we have noted, UNRRA did not have a contractual relation to Union. Furthermore, UNRRA has done nothing which might be construed as an agreement to create a lien in favor of Union. There is, therefore, no lien in favor of Union or its assignee MTC, and the Government's counterclaim to the claim in Case No. 48867 must be allowed to the amount of that claim.

Defendant's remaining counterclaim against plaintiff is one against plaintiff in his own right, not by virtue of assignment or succession. It involves the question of fraudulent conveyances; whether plaintiff was either a conveyee or otherwise a guilty participant in such conveyances.

The facts on this branch of the case, stripped of unnecessary complications, present the following picture. The complex of enterprises now known as Union Industries, Inc., was formed in 1944 by consolidating several independent corporations. During 1945 Union was primarily engaged in the performance of Government contracts but its business also consisted of engineering, manufacturing and installing work for commercial customers. Two stockholders, Annan and McKelvy, held almost all of Union's stock.

In 1945 one Alfred H. Sachs owned more than one-half of the common stock of MTC and was its president. Sometime in the first half of 1945 Sachs entered upon negotiations with the owners of Union with a view to acquisition of Union

by certain proposed purchasers represented by Sachs. The record does not show the details of these negotiations or what parties took part in them. Incident to this Sachs made an investigation of Union's financial condition. The negotiations culminated in a multiple deal which was finally consummated on June 15, 1945, and during the succeeding two months.

The following is a skeletal record of what transpired in this deal. Sachs and two associates had formed the Globe corporations, Sachs owning 40 percent of Globe's $15,000 total capital stock. Globe received a loan of $315,000 from Pittsburgh Finance Corporation which was controlled by one of Sachs' two associates in Globe corporation. Pittsburgh Finance Corporation had at about that time received a loan of $250,000 from MTC. Globe used the money it thus raised to pay Annan and McKelvy $312,954 for their stock in Union. Having acquired control of Union, Globe issued $300,000 of its own debentures to Union for which Union paid in cash. Globe then proceeded to pay off its loan to Pittsburgh Finance Corporation which in turn paid its debt to MTC. The net result of this series of transactions was to transfer $300,000 of Union's cash assets to Annan and McKelvy and to put Sachs and his associates in control of Union. The worth of the bonds Globe had given to Union can be gauged from a list of Globe's assets after it had bought Union: less than a thousand dollars cash and the stock of Union.

At the time of the stock deal and probably made in contemplation of it, several other transactions occurred between Union and its old owners, Annan and McKelvy. A brick plant with a book value of $876,000 was sold to them (through a strawman) for $100,000. There is little evidence of its actual value and what evidence there is indicates that the plant was worth much less than its book value. An airplane and a brick inventory were sold to them at a price of about one-half the book value. In addi-

tion, McKelvy received $200,000 cash and $200,000 in notes, which were secured by patents, for a $400,000 mortgage which he held on the brick plant.

There is considerable evidence in the record that Union was in a weak financial position, if not insolvent, at the time all these transactions occurred, but we do not find it necessary to determine the question of insolvency one way or the other. Sachs was evidently not deterred by these facts, and thought that he could turn the enterprise into a money-making proposition, for on June 15, 1945, MTC made a "factoring agreement" with Union whereby MTC was to loan to Union 75 percent of the value of all acceptable receivables of Union, secured by assignment of such receivables. Moreover, Sachs and his two associates in Globe corporation loaned $100,000 of their own money to Union, with Pittsburgh Finance Corporation and MTC acting as intermediaries.

MTC continued lending Union large amounts over the next several years but, in the end, Union failed to prosper. Its operation ceased early in 1947. By November 30, 1950, Union owed MTC an unpaid balance of $1,131,715.49, representing both unpaid interest and principal. Sachs and his associates also were able to recover only a part of their $100,000 loan to Union. The United States, a heavy creditor of Union throughout the whole period since 1944, remained unpaid. Eventually MTC went bankrupt.

The transactions most relevant to this part of the case may then be summarized as follows. Annan and McKelvy received $312,954 for their stock in Union; this money was derived from Union and represented, in effect, a partial liquidation in their favor. They received an uncompleted brick plant and other assets of Union at a great discount from their book values. Union also settled fully on a $400,000 obligation it owed to McKelvy. MTC made advances to Union under a "factoring agreement" whereby Union was to assign all acceptable receivables

to MTC and MTC would lend 75 percent of their value to Union.

■ The question raised at this point is whether MTC is in any way liable to the creditors of Union (among whom is the United States) for its participation in any of the aforesaid transactions. Defendant relies in the main on the theory of conveyances in fraud of creditors. Only one of the transactions, the "factoring agreement" and assignments made in pursuance thereof, resulted in transfer of assets to MTC. From the available evidence it is not entirely clear whether this transaction is governed by the laws of Maryland, Pennsylvania, or Ohio. We need only decide, however, that the transfer was not fraudulent in relation to Union's creditors under the laws of any of these states. MTC gave fair consideration for what it received and Union's estate was not unfairly diminished as a result of the "factoring agreement" or assignments made upon it. Such conveyances, not being fraudulent, cannot be set aside.

■ Defendant also seeks to assert a claim in tort against MTC for having taken part in allegedly fraudulent conveyances from Union to third parties. In regard to the settlement of McKelvy's $400,000 obligation, MTC cannot be liable for its participation since this transaction did not amount to a fraudulent conveyance in any event. The cancellation of the preexisting debt was fair consideration. At the very most that transaction amounted to a preference of a creditor but MTC need not respond in damages for participating in such a plan. Duell v. Brewer, 2 Cir., 92 F.2d 59, 112 A.L.R. 1246.

■ Plaintiff's liability, if any, in regard to the remaining transactions to be considered is one in tort also. There is some difficulty as to the applicable law. If we apply the Federal law on the question, the rule is settled that no action lies in tort for aiding another in a fraudulent conveyance. Adler v. Fenton, 24 How. 407, 16 L.Ed. 696; Duell v. Brewer, supra. No Maryland statute or adjudicated Maryland case has come to our attention which decides whether or not those aiding a fraudulent conveyance are liable in tort. We may properly, therefore, apply the rule accepted by the weight of authority, particularly also the rule in the Federal courts. Generally no such action is recognized. Duell v. Brewer, supra.

Ohio and Pennsylvania, on the other hand, do have such an action. Iddings v. Whitacre, 1 Ohio App. 223; Mott v. Danforth, 6 Watts 304; Penrod v. Mitchell, 8 Serg. & R. 522. But even there the decided cases involved schemes with an actual intention of hindering or delaying creditors, not merely technical fraudulent conveyances, i. e., conveyances fraudulent merely because causing or increasing the debtor's insolvency.

■ Aside from any question of the applicable rule of law, we do not find here sufficient facts to sustain a cause of action. The evidence does not justify a finding that MTC had knowledge at the time of the transactions that Union was insolvent, or would be rendered insolvent thereby. The evidence on insolvency is itself somewhat indeterminate if we apply the appropriate test that the then present, fair, salable value of the assets was less than the amount that would have been required to pay the probable liability on existing debts as they would become absolute and matured. In addition, not all the means of proof which we now have on this point were available to MTC at the time it participated in these dealings.

MTC made large loans to Union immediately after the dealings of which defendant complains. It is unlikely that it would have made these loans unless it felt that the outstanding commercial and Government contracts which Union then had in hand, together with its other assets, made Union a going concern whose solvency had not been jeopardized by these dealings. On this phase of the case we must find against the defendant's contention.

Plaintiff is entitled to recover $63,000 in Case No. 49884; $231,276.61, with in-

terest as provided by law in Case No. 413–52; $8,879.83 in Case No. 50115; and $248,375 in Case No. 48867. Defendant is entitled to recover $248,375 as an offset in the amount of plaintiff's claim in Case No. 48867. The defendant's remaining counterclaims in this and the other cases are dismissed. Judgment, therefore, is entered in favor of John A. Hadden, Trustee for Manufacturers Trading Corporation, in the net amount of $303,156.44.

There remains one further problem. The consolidated cases now before us originally included the following individual petitions:

Case No. 48867, filed September 24, 1948
Case No. 49034, filed February 25, 1949
Case No. 49831, filed September 27, 1950
Case No. 49884, filed October 26, 1950
Case No. 50008, filed January 19, 1951
Case No. 50115, filed April 19, 1951.

Later Case No. 413–52, filed August 7, 1952, was added. Hadden, trustee for MTC, or MTC are the only parties plaintiff in all except two of these petitions. In Case No. 49034 Union originally appeared as plaintiff but on December 13, 1950, a motion to substitute Hadden as plaintiff was allowed in that case. In No. 49831 both Union and Hadden sued as plaintiffs.

On October 12, 1950, the defendant filed a general traverse in Case No. 49831. On December 13, 1950, the case was consolidated with No. 48867 where Hadden was the only plaintiff. During the next year defendant filed six counterclaims in Case No. 49831, of which all but the fourth were made against both Union and Hadden. The fourth was against Hadden alone. Union filed replications to each of the counterclaims. On October 31, 1951, No. 49831 was consolidated with still other cases.

■ When the consolidated cases came to trial, Union was not represented by counsel. Counsel for Hadden admitted the liability of Union on the issues involved in counterclaims 1, 2, 5, and 6 to Union's petition in No. 49831 and also admitted Union's liability on the issue involved in part of the third counterclaim in that case. We do not think that the admissions by counsel for Hadden have a binding effect on Union.

■ On October 13, 1953, there was filed with the court a stipulation under the heading of Case No. 49831 providing that "the attorneys for the respective parties do hereby stipulate that the petition of the plaintiff and each and all of the counterclaims of the defendant may be dismissed." This document was signed by Arter, Hadden, Wykoff, and Van Duzer, attorneys for plaintiff, and by Wm. A. Stern II and Warren E. Burger on behalf of the Government. It operated to cause a dismissal of the petition of Hadden and the defendant's counterclaims made thereto. (Cases Nos. 49034 and 50008 which involved only the United States and Hadden were dismissed pursuant to similar stipulations filed on that same date.) The stipulation in Case No. 49831 did not bear the signature of Samuel K. Walzer, attorney of record for Union, or of anyone else purporting to act for Union. Union's petition is, therefore, still before us, as are the counterclaims made thereto.

Neither Union nor the defendant has introduced any evidence on the respective claim and counterclaims. We will withhold entry of judgment for a period of thirty days to afford the parties an opportunity to signify an intention to produce evidence upon the claims of Union and the counterclaims against Union in Case No. 49831. If no further steps are taken in this matter within that period both the claim of Union and the counterclaims against Union will be dismissed.

It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.